# Illinois Official Reports

## Appellate Court

---

### *People v. Rosalez*, 2021 IL App (2d) 200086

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY ROSALEZ, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0086 |
| Filed | September 15, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-361; the Hon. Todd B. Tarter, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Leonard C. Goodman and Melissa A. Matuzak, of Len Goodman Law Office LLC, of Chicago, for appellant.<br><br>Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BRENNAN delivered the judgment of the court, with opinion.<br>Justices Hudson and Birkett concurred in the judgment and opinion. |

¶ 1 The State charged defendant, Tony Rosalez, with first degree murder for the January 2009 shooting death of the victim, Paola Rodriguez. 720 ILCS 5/9-1(a)(1), (2) (West 2008). The State alleged that defendant was the shooter, and it did not pursue an accountability theory at trial. The jury convicted defendant of first degree murder. However, it answered a special interrogatory, which the State had submitted in order to seek a sentencing enhancement, by finding that the State did not prove beyond a reasonable doubt that defendant personally discharged the firearm that proximately caused the victim's death. The trial court sentenced defendant to 35 years' imprisonment for first degree murder but, given the jury's answer to the special interrogatory, did not impose a sentencing enhancement for personally discharging a firearm that proximately caused the victim's death.

¶ 2 We affirmed the conviction and sentence on direct appeal. In relevant part, defendant unsuccessfully argued that the trial court committed plain error by restricting his cross-examination of a codefendant, Manith Vilayhong. *People v. Rosalez*, 2016 IL App (2d) 140431-U, ¶ 28.

¶ 3 Defendant now appeals the trial court's stage-two dismissal of his postconviction petition, filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He argues that he made a substantial showing of (1) actual innocence based on newly discovered evidence that Vilayhong actually committed the charged offense and (2) ineffective assistance of appellate counsel, where appellate counsel failed to raise a plain-error argument concerning the trial court's response to a jury question and where appellate counsel failed to challenge the sufficiency of the evidence. For the reasons that follow, we agree with defendant's first argument, but we reject his second argument. We remand the case for a stage-three evidentiary hearing on the issue of actual innocence.

¶ 4 I. BACKGROUND

¶ 5 A. Pretrial Proceedings and Other Matters

¶ 6 In February 2009, the State charged defendant with first degree murder, alleging that he personally discharged the firearm that killed the victim. The State indicated its intent to seek an enhancement of defendant's sentence of 25 years to life in prison, based on the allegation that he personally discharged the firearm.

¶ 7 In 2010, the State entered into a plea agreement with two codefendants, Vilayhong and Raul Perez-Gonzalez. Vilayhong was a leader of the Maniac Latin Disciples gang, and he claimed to have ordered the shooting while in the vehicle from which the shots were fired. Perez-Gonzalez drove the vehicle. Each pled guilty to first degree murder in exchange for a sentence of 35 years' imprisonment, which would be reduced to 20 years' imprisonment if they testified truthfully for the State at defendant's trial. The factual bases for each of the codefendant's pleas were premised on an accountability theory.

¶ 8 At an October 2011 status hearing, the State informed the court that Perez-Gonzalez was refusing to testify at defendant's upcoming trial, in contravention of his plea agreement. See *People v. Perez-Gonzalez*, 2014 IL App (2d) 120946, ¶ 5. At the State's request, the court called Perez-Gonzalez before it, placed Perez-Gonzalez under oath, and asked Perez-Gonzalez whether he intended to testify against defendant. Perez-Gonzalez, while represented by

counsel, informed the court that he intended to refuse to answer any questions related to the January 2009 shooting death, both at the status hearing and at the upcoming trial. The court ordered Perez-Gonzalez to answer questions pertaining to the shooting death:

"THE COURT: *** So this is the court's order that you answer the questions, sir. Do you wish to have the questions read again?

[PEREZ-GONZALEZ]: No, because I'm not gonna answer.

THE COURT: All right, sir, the court would find you in direct contempt. Remove that person now."

In November 2011, the State petitioned for an adjudication of criminal contempt against Perez-Gonzalez, alleging that Perez-Gonzalez was persisting in his refusal to testify at defendant's upcoming trial. *Id.* ¶ 7. In May 2012, the court found Perez-Gonzalez in contempt for refusing to testify at defendant's trial as ordered by the court. *Id.* ¶ 10.

¶ 9         In June 2012, the court conducted the contempt sentencing hearing. The parties stipulated that Perez-Gonzalez had pled guilty to first degree murder for his role in the 2009 shooting. His 35-year sentence had not been reduced to 20 years as originally contemplated because he had refused to testify at defendant's trial. The court found that Perez-Gonzalez's refusal to testify had hindered the State's prosecution of defendant in that the State had been unable to secure the sentencing enhancement. The court reasoned that Perez-Gonzalez's contempt sentence should serve as a deterrent to other similar conduct. Thus, the court sentenced Perez-Gonzalez to 10 years' imprisonment for contempt, consecutive to his 35-year sentence for first degree murder. *Id.* ¶¶ 11-12.

¶ 10                                    B. Defendant's Trial

¶ 11         Meanwhile, in February 2012, defendant's trial commenced. As an overview, the evidence established that, on January 30, 2009, the victim was visiting her cousin, Sara Almanza. Almanza's boyfriend, Omar Zavala, was a member of the Insane Deuces street gang. The victim and Almanza were spending time with Zavala and another man. The group drove in two different cars to a BP gas station.

¶ 12         While at the gas station, a white Ford Expedition drove by containing defendant, age 18; the driver, Perez-Gonzalez, age 18; Vilayhong, age 22; Jose Gonzalez, age 21; and Jose Pellot, age 15. Vilayhong shouted gang slogans and threw gang signs at the victim's group.

¶ 13         Zavala responded with competing gang slogans, and the victim's group disbanded. The two women left in a Pontiac, and the two men left in a Durango. The Expedition followed the Durango and the Pontiac. Ultimately, the Expedition pulled up alongside the Pontiac and one of the occupants shot the victim, who was driving. The Expedition then sped away.

¶ 14         Most relevant to the instant appeal is the testimony of the occurrence witnesses (Almanza, Vilayhong, Gonzalez, and Pellot) and of the lead investigator, Jim Lalley, which we recount below.

¶ 15                                    1. Almanza

¶ 16         Almanza testified that, after the Expedition pulled alongside the Pontiac, where she was in the front passenger seat, she heard a gunshot, and the driver's window shattered. She also saw a flash and observed that the Expedition's front passenger window was open. The victim was

struck and slumped over the steering wheel. Almanza moved her foot over the center console to hit the brakes and stop the car.

¶ 17   Almanza acknowledged that she did not see the person who shot the victim. She said "I couldn't see anything because the [Expedition] was higher than the car that we were in." Also, she explained, "I was like in a daze for a second *** I mean I did see the [Expedition] drive off, and then I stopped the vehicle." When asked whether the Expedition's back passenger window was open, she answered, "I don't remember. I don't think that was open."

¶ 18                                    2. Vilayhong

¶ 19   Vilayhong testified that, in 2009, he was a "governor" of the Maniac Latin Disciples street gang. He was "in charge of" nonranking members, like defendant. On the evening in question, Perez-Gonzalez had driven Vilayhong's group in the Expedition to the Stop and Shop to buy beer. Vilayhong and defendant went inside the Stop and Shop. Upon leaving the store and returning to the Expedition, defendant got into the front passenger seat, and Vilayhong sat behind him. Vilayhong saw a group of people across the street (Zavala and the other man), whom he believed to be in a rival gang. Vilayhong ordered Perez-Gonzalez to drive the Expedition closer to the rival gang members. Upon confirming that they were members of the Insane Deuces, Vilayhong threw gang signs and yelled gang slogans, including "Deuce killer," which meant that he was "letting them know [he's] gonna kill 'em." None of the other people in the Expedition participated:

> "Q. The other people that are in your Expedition, what are they doing?
>
> A. Nothin'.
>
> Q. Was the Defendant saying anything?
>
> A. No."

¶ 20   The rival gang members responded with gang signs and slogans of their own, such as "Deuce love, Maniac killer," before driving away.

¶ 21   Vilayhong ordered Perez-Gonzalez to follow them. Vilayhong ordered defendant to "shoot 'em, shoot 'em" and threatened him with a gang violation if he did not. Defendant initially refused to comply. Vilayhong ordered defendant to give him the gun. Defendant again refused to comply. Vilayhong then "reached [his] body out the window" and screamed "Maniac" to the other car. He believed that defendant, or at least defendant's arm, was also hanging out of the window. When the people inside the other car did not respond to his gang slogans, he realized that they were "innocent." However, at that moment, he heard a shot, and it was too late. Vilayhong clarified that both defendant's and his windows were down when the shot was fired.

¶ 22   After the shooting, defendant left the group and went home. Vilayhong and the others went to a car wash to remove gunshot residue. Vilayhong then called his friend, Andres Garza, for a ride home.

¶ 23   Vilayhong testified inconsistently as to the gun. On direct examination, he testified that he gave the gun to defendant 20 to 30 minutes before they arrived at the Stop and Shop and that he did *not* know what happened to the gun after the shooting. On cross-examination, Vilayhong testified that he gave the gun to defendant several weeks before the shooting. When confronted with the inconsistency, he returned to his original position that he gave defendant the gun the

night of the shooting. He also changed his position regarding what happened to the gun after the shooting, stating that he "think[s]" he gave the gun to Garza for disposal.

¶ 24 Vilayhong further explained to the jury that he had entered into a plea agreement with the State, wherein he pled guilty to first degree murder in exchange for a 35-year sentence, which would be reduced to 20 years if he testified truthfully against defendant. Vilayhong felt relieved not to be facing the "shooter spot." Also, Vilayhong acknowledged that, in 2002, he had been hospitalized for bipolar manic depression and intense anger and aggression issues. He stopped taking his prescribed medication upon release from the hospital and has not taken it since.

¶ 25                                     3. Gonzalez

¶ 26 Gonzalez testified that, at the time of the shooting, he was a member of the Spanish Cobras gang. To his knowledge, Vilayhong and defendant were members of the Maniac Latin Disciples but Perez-Gonzalez and Pellot were not members of any gang.

¶ 27 On the evening in question, Vilayhong became "hyped up and angry" upon seeing members of a rival gang, the Insane Deuces, at the BP gas station.[1] Vilayhong told the group that they should "jump out" on the rival gang. Vilayhong told Perez-Gonzalez, who was driving the Expedition, to pursue the rival gang members. Vilayhong hung out the back passenger window, throwing gang signs and yelling "Maniac and Deuce killer." Vilayhong told Perez-Gonzalez to pull alongside the Pontiac. Vilayhong told defendant that he "better do it," meaning shoot the rival gang members. Gonzalez saw defendant, who was sitting in the front passenger seat, put his window down and stick his arm out. Gonzalez then saw a flash and heard a "pop" come from defendant's window. After the shooting, defendant left the group and went home. Gonzalez did not see defendant give anyone the gun before leaving. The group then went to the car wash.

¶ 28 On cross-examination, Gonzalez agreed that Vilayhong was the one "running the show." Vilayhong was the only one throwing gang signs and yelling gang slogans. Gonzalez testified inconsistently as to whether Vilayhong's window was down at the time of the shooting. First, Gonzalez testified that Vilayhong's window *was* down completely and stayed down the entire time. However, he later testified that Vilayhong had rolled up his window by the time they had pulled up alongside the Pontiac. He acknowledged that he never told the police that Vilayhong's window was up at the time of the shooting. Even though Vilayhong's window was tinted, Gonzalez, who sat beside Vilayhong, could see through it to discern that defendant put his arm out the front window and caused a flash.

¶ 29 Gonzalez also acknowledged that he denied being in the Expedition when first interviewed by the police. Upon admitting that he was in the vehicle, he failed to mention that Pellot was in the vehicle because Pellot was his "little cousin" and he wanted to protect him. The State later gave Gonzalez use immunity, and he testified for the State.

¶ 30 On redirect examination, the State returned to the issue of Vilayhong's window, establishing that Gonzalez had never told the police that Vilayhong had rolled up his window but also that the police had not asked him about Vilayhong's window.

---

[1]Gonzalez testified, incorrectly, that the group at the gas station consisted of three men and one woman, not two men and two women.

¶ 31                                                    4. Pellot

¶ 32        Pellot testified that he was in the Expedition because he was spending time with his cousin, Gonzalez. He did not know Vilayhong at the time of the shooting. He had known defendant for less than one year and did not know him to be in a gang. He did not remember much from the night of the shooting because he was intoxicated. He had blacked out by the time they left the Stop and Shop. He did not know who was driving the Expedition. He did, however, remember that defendant sat next to him, on his left, in the third row—not the front passenger seat—of the Expedition.

¶ 33        The State impeached Pellot on each of these points with Pellot's February 2, 2009, recorded statement to police. In the 2009 statement, Pellot stated that he had known Vilayhong for over one year. He had known defendant for over two years and was aware that defendant was a Maniac Latin Disciple. He knew that "Raul," *i.e.*, Perez-Gonzalez, was driving the Expedition. He had told the police that defendant sat in the front passenger seat, not in the third row. As for the shooting, the State read to Pellot the transcripts from the police interview:

        "Q. What was [Vilayhong] doing?

        A. Pressuring [defendant]. Just get 'em, get 'em, shoot 'em. Hurry up, get 'em. *** Gimme it if you're not gonna do it, gimme it, and Tony said, no, I got it.

        Q. Okay, and, uh, what happened? You say Tony shot?

        A. Yeah, he did."

¶ 34        When confronted with his 2009 statement about Vilayhong, Pellot acknowledged making it. However, he explained:

        "Q. You just made that stuff up in that statement?

        A. I was asked to do it, yeah.

        Q. I'm sorry?

        A. I was asked, I was told to say that."

¶ 35        On cross-examination, Pellot further clarified that he made the 2009 statement while in custody at the juvenile detention center for an unrelated matter. He was questioned by two officers, and neither his parents nor an attorney was present. The officers talked to Pellot at length before taking his statement. Pellot agreed that the following exchange had occurred:

        "Q. Do you remember the next question [at the 2009 interview] being: 'Okay, and is uh, the person known, that you know as Raul, is that [because] you know him by the name Raul [or] is that because you heard me mention his name or his first name?' Your answer: 'I don't really know. I mean I just heard you mention his name.'

        A. Right."

¶ 36        Pellot testified that, before he gave his 2009 statement, he had spoken with Gonzalez. In actuality, he did not remember much from the night in question. He had imbibed alcohol, Coronas and a "bottle of something," and had ingested marijuana. He did, however, remember that defendant sat next to him in the third row of the Expedition.

¶ 37        On redirect, the State asked Pellot to confirm that, although he remembered virtually nothing from the night in question, he nevertheless had an "explicit" memory that defendant sat next to him in the third row of the Expedition. Pellot so confirmed.

### 5. Jim Lalley

Lalley, a sergeant with the Elgin Police Department, was the lead investigator on the case. The day after the shooting, Lalley and two other officers saw defendant walking down the street. Lalley approached in his vehicle and, with the window down, instructed defendant to get on the ground. Instead, defendant fled. The two other officers gave chase and quickly apprehended defendant.

Lalley interviewed defendant after informing him of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant admitted that he was in the Stop and Shop across from the BP gas station, but he would not say with whom. Eventually, he implicated Perez-Gonzalez as owning the Expedition. He stated that, after he left the Stop and Shop, he got into the rear seat of the Expedition. He acknowledged seeing members of a rival gang across the street, but he said that nothing occurred. Eventually, he admitted to hearing two loud booms. When asked who the shooter was, defendant asked for his parents.

### 6. Jury Instructions

The trial court provided the following instruction for first degree murder:

> "A person commits the offense of first[-]degree murder when he kills an individual if, *in performing the acts which cause the death*, he intends to kill or do great bodily harm to that individual or another, or he knows that such acts create a strong probability of death or great bodily harm to that individual or another." (Emphasis added.)

At the State's request, the trial court also provided the jury with a special interrogatory for the purpose of seeking a sentencing enhancement. The court instructed the jury, in pertinent part, as follows:

> "If you find the Defendant is guilty of first[-]degree murder, you should then go on with your deliberation to decide whether the State has proved beyond a reasonable doubt the allegation that the Defendant personally discharged a firearm that proximately caused the death to another person."

### 7. Deliberations

During deliberations, the jury submitted several questions, one of which is pertinent to this appeal: "Clarification of 1st Degree Murder. If a person is in a vehicle when a felony occurs, can they be charged with that felony?" The court and the parties discussed the question:

> "THE COURT: Okay. The first one I will just read it as it's written. [']Clarification of first[-]degree murder. If a person is in a vehicle when a felony occurs, can they be charged with that felony?['] Something written on the . . Something written is crossed out. I presume that's not a question that's pending.
>
> * * *
>
> The court's initial feeling is the instructions adequately cover the elements of first[-]degree murder. No additional response would be necessary.
>
> STATE: *** [T]he State would agree ***.
>
> DEFENSE COUNSEL: And I understand why the Court is saying that, but apparently they're asking almost on accountability[/]mere presence. The question doesn't even seem to get into felony murder. At this point I'm not sure what the other one is, but I don't know [about] giving them additional law on that. He was not charged

under the accountability theory, and that was not argued so I'm not sure that instruction should go back.

 THE COURT: The Court is going to respond that the jury already has adequate instruction on the charge of first[-]degree murder. I would decline any further enlightenment relative to this question. It would appear that question, to answer it, whether it be felony murder or accountability, would interpose a new theory not raised by either party. That's the basis of the Court's decision."

Defense counsel did not object.

¶ 46　　The court sent back the following response: "You have received the appropriate instruction on the elements of the offense charged which is first degree murder. The instruction given is the appropriate instruction."

¶ 47　　　　　　　　8. General Verdict and Special Interrogatory

¶ 48　　The jury returned a general verdict of guilt. ("We, the jury, find the defendant, Tony Rosalez, guilty of first[-]degree murder.") However, it answered the special interrogatory in the negative. ("We, the jury, find the allegation that during the commission of the offense of first degree murder the defendant personally discharged a firearm which proximately caused death to another person was not proven.")

¶ 49　　　　　　　　　　　C. Motion for a New Trial

¶ 50　　Defendant filed posttrial motions for a judgment notwithstanding the verdict (JNOV) and, alternatively, a new trial. Specifically, defendant argued that the jury's answer to the special interrogatory "negated," or provided a basis by which to challenge, the general verdict of guilty. He acknowledged that the supreme court has rejected this argument as pertains to inconsistent verdicts for separate charges (see *People v. Jones*, 207 Ill. 2d 122 (2003)), but he noted that it has not yet addressed "inconsistences within the same charge."

¶ 51　　Also, defendant argued that he was entitled to a new trial because the trial court erred in responding to the jury's question, *i.e.*, "If a person is in a vehicle when a felony occurs can they be charged with that felony?" Instead of answering that the jury should look to the instructions already provided, the trial court should have answered that "mere presence at the scene is not sufficient to prove the defendant guilty beyond a reasonable doubt."

¶ 52　　The trial court denied defendant's posttrial motions in an oral ruling. It explained:

 "I believe the case is controlled by the decision of the Appellate Court in *People v. Reed*, [396 Ill. App. 3d 636 (2009),] which is from the Fourth District. The *Reed* case relied heavily on *People v. Jackson*, [372 Ill. App. 3d 605 (2007),] also from the Fourth District, and as [the State] pointed out, the *Reed* decision is nearly on, completely on all fours with this particular case, with slight variations that in my judgment would not affect the legal conclusions."

*Reed* determined that a jury's negative answer to a special interrogatory as in the instant case does not provide a basis by which to challenge a general verdict of guilty. The trial court did not expressly address its response to the jury's question.

¶ 53                                    D. Direct Appeal

¶ 54    On direct appeal, defendant argued that the trial court committed plain error by restricting his cross-examination of Vilayhong. *Rosalez*, 2016 IL App (2d) 140431-U, ¶ 18. Defendant contended that the trial court erred in precluding him from questioning Vilayhong as to whether the prospect of receiving the death penalty, or his psychological diagnosis as a malingerer, influenced his decision to plead guilty and testify against defendant. *Id.*

¶ 55    We affirmed defendant's conviction on direct appeal. *Id.* ¶ 28. We explained that defendant was given the opportunity to explore Vilayhong's key motive for pleading guilty and testifying against defendant—a lenient sentence. *Id.* ¶ 22. Additional alleged motives, stemming from a fear of the death penalty (which had been abolished in Illinois by the time defendant's trial started) and a diagnosis as a malingerer, were highly speculative; examining them would have done little to further call into question the veracity of Vilayhong's testimony. *Id.* ¶¶ 22, 26.

¶ 56                          E. Defendant's Postconviction Petition

¶ 57    On October 25, 2017, defendant, represented by counsel, filed the postconviction petition at issue in this appeal. Defendant raised two claims: (1) actual innocence as supported by the affidavits of Vilayhong, Perez-Gonzalez, Garza, and defendant and (2) ineffective assistance of appellate counsel based on counsel's failure to (a) argue that the trial court committed plain error by failing to respond to the jury's question ("If a person is in a vehicle when a felony occurs can they be charged with that felony?") with a clarifying instruction and (b) challenge the sufficiency of the evidence.

¶ 58                                1. Vilayhong's Affidavit

¶ 59    Vilayhong attested that, on the date of the shooting, he had a gun on his person because he was "having some issues with the [D]euces." When he saw members of the Insane Deuces at the BP gas station, he ordered Perez-Gonzalez to follow them. Vilayhong was "out the window" hoping to shoot at Insane Deuces in the Durango. However, Perez-Gonzalez stated that the smaller car (the Pontiac) also contained Insane Deuces. Therefore, as the Expedition passed the car, Vilayhong shot once at it. Vilayhong noticed the car stop, but he went back to focusing on the Durango. At that point, however, the Durango had gotten away.

¶ 60    Immediately after the incident, the group dropped defendant at his house. Vilayhong then told everyone in the car that, if questioned about the incident, they were to identify defendant as the shooter. He repeated these instructions a short time later. Vilayhong was a governor of the Maniac Latin Disciples. He had a reputation for being an "enforcer" who would "violate" other gang members who did not follow the rules. "I used my influence in the gang and the fear that people had of me to have other people identify [defendant] as the shooter."

¶ 61    Vilayhong further averred:

    "It was not until later that I learned that the person that was shot was a girl. If I had known who was in the car, I would not have shot at the car but would have instead shot at the Durango. It was never my intention to shoot an innocent."

¶ 62    As to the investigation, Vilayhong stated that, when contacted by the police, "I immediately got an attorney and didn't say anything. For [18] months, I said nothing to the police ***." At some point, Vilayhong's attorney advised him that defendant was planning to testify against him. Thereafter, Vilayhong decided that he needed to testify against defendant.

¶ 63     Presently, Vilayhong "feel[s] bad" that defendant is doing time as the shooter, when he knows that defendant was not the shooter and that he "played a role" in defendant's conviction. He "later" tried to contact defendant's trial attorney, but he did not receive a response. He "recently" received letters from defendant's new attorneys and a private investigator, to whom he provided the information contained within his affidavit.

¶ 64                                2. Perez-Gonzalez's Affidavit

¶ 65     Perez-Gonzalez signed two affidavits, one hand written and one typed and signed, containing substantively similar information. Perez-Gonzalez attested that, on the date of the shooting, Vilayhong ordered Perez-Gonzalez to drive to the BP gas station. Vilayhong hung out of the window and yelled gang slogans at members of the Insane Deuces, who were at the BP gas station. Vilayhong's window was the only window that was down. Vilayhong then told Perez-Gonzalez to follow the Durango and the Pontiac. When Perez-Gonzalez began to follow the vehicles, Vilayhong was not hanging out of the window. As the group approached the vehicles, Vilayhong told defendant to take the gun and shoot at the vehicles. Defendant refused, and Vilayhong threatened to "violate" him. Defendant did not take the gun. When Perez-Gonzalez pulled up alongside the Pontiac, Vilayhong went out of the window again and shot at the Pontiac.

¶ 66     After the shooting, defendant asked to be dropped off at his house, which was nearby. Vilayhong told Perez-Gonzalez to find a car wash. Vilayhong and Perez-Gonzalez cleaned the car inside and out. While at the car wash, Vilayhong told the group that, if caught, they were to identify defendant as the shooter. After the car wash, Perez-Gonzalez picked up a person at Burger King named "Tough Tony," *i.e.*, Garza.

¶ 67     When interviewed by the police, Perez-Gonzalez lied and told police that defendant was the shooter. He was "not truthful about who the real shooter was." He was afraid to tell the truth because he "knew how crazy [Vilayhong] could be." He was "afraid of what could happen to [him] if [he] was truthful about [Vilayhong] being the shooter." He knew Vilayhong to be an "enforcer" for the Maniac Latin Disciples.

¶ 68     Perez-Gonzalez explained the terms of his plea agreement. He understood that, if he testified at defendant's trial to events as initially told to police, he would receive a prison sentence of 20 years instead of 35 years. However:

> "Knowing that I would be helping to prosecute the wrong person as the shooter, I decided not to take the plea deal and when I appeared in court and was sworn in, I only answered questions about my name and age and chose not to answer any other questions. I was advised that I could be charged with criminal contempt and still chose not to answer. I could have easily said that [defendant] was the shooter and gotten 20 years but instead chose to take the 35 years."

¶ 69                                      3. Garza's Affidavit

¶ 70     Garza attested that, on the night of the shooting, Vilayhong called and asked him to meet at a fast-food restaurant. Once there, Vilayhong told Garza that he had gotten into an altercation with a rival gang and that he had shot at their car. Vilayhong told Garza that, if anyone were to ask about the shooting, he was to identify defendant as the shooter.

¶ 71    The next day, Vilayhong again called Garza, this time asking to meet in an alley. Vilayhong asked Garza to dispose of a gun. He again told Garza that, if anyone were to ask about the shooting, he was to identify defendant as the shooter.

¶ 72    When interviewed by the police, Garza told them that he saw defendant with a gun before the shooting incident, he met with Vilayhong and defendant "about the gun," and defendant told him that he was the shooter. These statements were not true. He only met with Vilayhong.

¶ 73    Garza had been afraid to tell the police the truth because he was afraid of what Vilayhong might do to him. He knew that Vilayhong was an "enforcer" for the Maniac Latin Disciples. "There were things I did not say out of true fear." Garza further explained: "Because of the fear and pressure that I was feeling, I moved to Texas for a couple of years after all of this."

¶ 74    When Garza returned to Illinois, he made efforts to stay away from the gang life. Recently, a private investigator approached Garza, and Garza provided the information contained in the affidavit. Although Garza is no longer a gang member, he "still has concerns and fears about coming forward with the truth but want[s] to do the right thing."

¶ 75                                    4. Defendant's Affidavit

¶ 76    Defendant attested that, while in jail awaiting trial, his attorney gave him copies of the discovery in his case. He was aware that the two codefendants, Vilayhong and Perez-Gonzalez, had given statements naming him as the shooter. Defendant was also aware that Gonzalez testified at a preliminary hearing, named defendant as the shooter, and was given (use) immunity.

¶ 77    Trial counsel told defendant that Vilayhong, Perez-Gonzalez, and Gonzalez were the State's witnesses and would not be available to testify truthfully for defendant. Defendant asked about Pellot, and trial counsel answered that Pellot was also on the State's witness list. Defendant accepted trial counsel's information. Defendant was incarcerated and had no ability to conduct his own investigation.

¶ 78    Defendant learned, in October 2011, that Perez-Gonzalez was refusing to testify for the State. However, defendant's trial counsel told him that Perez-Gonzalez was not willing to testify for the defense, either. Defendant also learned, prior to trial, that Garza had spoken to police. However, he was not aware, until being informed by postconviction counsel, that Garza had information that could help him.

¶ 79    Three years after his trial, in 2015, trial counsel sent a letter to defendant's parents' house, informing defendant that "some" witness wanted to recant his testimony. Defendant's family reached out to trial counsel, but trial counsel did not respond. Defendant's family then retained postconviction counsel.

¶ 80                      F. The State's Motion to Dismiss the Postconviction Petition
                                    and the Trial Court's Order

¶ 81    The trial court advanced the petition to the second stage, and the State moved to dismiss the petition. Substantively, the State responded as it does on appeal.

¶ 82    The trial court granted the State's motion to dismiss in a written order. As to defendant's actual-innocence claim, it noted that defendant was required to make a substantial showing that the evidence was (1) newly discovered, (2) material and noncumulative, and (3) of a conclusive character. See *People v. Sanders*, 2016 IL 118123, ¶ 24. The court determined that

only a small portion of the information contained in the affidavits was newly discovered. Specifically, only Vilayhong's statement that he ordered other gang members to blame defendant was newly discovered. There was no testimony on this point at trial, and there was "nothing in the record indicating that [defendant] knew this information." The court acknowledged that this evidence was material and noncumulative. However, the court determined that the evidence was not of such a conclusive character that, when considered alongside the evidence at trial, it would probably lead to a different result.

¶ 83 The trial court determined that the remainder of the information was not newly discovered. Per *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007), Vilayhong's statement that he was the shooter was not newly discovered because defendant, having been a passenger in the vehicle at the time of the shooting, would have known this information prior to trial. Per *People v. Edwards*, 2012 IL 111711, ¶ 37, none of Perez-Gonzalez's or Garza's statements were newly discovered because defendant cannot claim that he acted diligently when he failed to cause a subpoena to be issued to a reluctant witness.

¶ 84 Alternatively, the court found that, even if the statements were newly discovered, they were not of such a conclusive character that, when considered alongside the evidence at trial, they would probably lead to a different result. Per *Sanders*, 2016 IL 118123, ¶ 48, the new evidence that Vilayhong was the shooter was "directly rebutted" by the evidence at trial. Also, per *People v. Collier*, 387 Ill. App. 3d 630, 636-37 (2008), the new evidence did not "vindicate or exonerate" defendant.

¶ 85 As to defendant's ineffective-assistance claim, the trial court determined that appellate counsel was not ineffective for failing to raise a plain-error argument concerning the trial court's answer to the jury's question. Also, the court determined that appellate counsel was not ineffective for failing to challenge the sufficiency of the evidence. The court acknowledged that the general verdict and the special interrogatory answer were inconsistent. However, citing *Reed*, 396 Ill. App. 3d at 647-48, it explained that this inconsistency did not provide a basis to challenge the sufficiency of the evidence.

¶ 86                                    II. ANALYSIS

¶ 87 On appeal, defendant argues that the trial court erred in dismissing his postconviction petition at the second stage. Defendant contends that he made a substantial showing of (1) actual innocence based on newly discovered evidence that Vilayhong, not he, was the shooter and (2) ineffective assistance of appellate counsel, where appellate counsel failed to raise a plain-error argument concerning the trial court's response to the jury's question and where appellate counsel failed to challenge the sufficiency of the evidence. As we explain below, we agree with defendant's first argument but reject his second argument.

¶ 88                          A. Postconviction Proceedings

¶ 89 The Act provides a mechanism by which criminal defendants may assert that their convictions or sentences were the result of a substantial violation of their constitutional rights. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). It is not a substitute for a direct appeal but, rather, allows the defendant to assert a collateral attack on the final judgment. *Edwards*, 2012 IL 111711, ¶ 21.

¶ 90    The Act provides for a three-stage proceeding, and a defendant must satisfy the requirements of each before continuing to the next stage. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006) (non-death penalty cases). At the first stage, the trial court has 90 days to review the petition without input from the State. 725 ILCS 5/122-2.1(a)(2) (West 2016). The petition must present the gist of a constitutional claim, and the petition will survive so long as it is not frivolous or patently without merit. *Id.*; *People v. Hodges*, 234 Ill. 2d 1, 16 (2009).

¶ 91    At the second stage, the trial court may appoint counsel for the defendant, if the defendant is indigent. 725 ILCS 5/122-4 (West 2016). After counsel has made any necessary amendments to the defendant's claims, the State may move to dismiss or may answer the petition. *Id.* § 122-5. The petition and any accompanying documentation must make a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. All well-pleaded facts that are not positively rebutted by the record are taken as true. *Id.*

¶ 92    Finally, at the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted. *Id.* At that time, it makes fact-finding and credibility determinations. *Id.* The defendant must again make a substantial showing of a constitutional violation. *Id.*

¶ 93    Here, defendant had retained counsel to start the first stage of the postconviction proceedings. The petition advanced to the second stage, where the trial court dismissed it on the pleadings. Our review, therefore, is *de novo*. *Id.*

¶ 94                                B. Actual Innocence

¶ 95    A freestanding claim of actual innocence is cognizable under the Act. See *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). In a freestanding claim of actual innocence, the defendant asserts that he is "innocent of the crime for which he has been tried, convicted, and sentenced." *People v. Harris*, 206 Ill. 2d 293, 301 (2002). For a freestanding claim of actual innocence to survive the second stage, the petition and supporting documents must make a substantial showing that the evidence supporting actual innocence is (1) newly discovered, (2) material and not merely cumulative, and (3) of a conclusive character. *Sanders*, 2016 IL 118123, ¶ 24. Newly discovered means that the evidence was not available at trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means that the evidence is relevant and probative of the defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means that the evidence adds to what the jury heard. *Id.* Finally, evidence is of a conclusive character where, when considered along with the trial evidence, it would probably lead to a different result. *Id.* As we explain below, the petition and supporting documents here, properly construed, make a substantial showing as to all three of the actual-innocence prongs such that the petition should have been advanced to the third stage.

¶ 96                                1. Newly Discovered

¶ 97    We first address the "newly discovered" prong. Again, newly discovered evidence is evidence that was unavailable at trial and could not have been discovered earlier through the exercise of due diligence. *Burrows*, 172 Ill. 2d at 180. The trial court agreed with the State that defendant could not satisfy the newly discovered prong where he knew, prior to trial, that Vilayhong was the shooter. In support, the State quotes the following rule: "Generally, evidence is not 'newly discovered' when it presents *facts already known to the defendant* at or

prior to trial, though the source of those facts may have been unknown, unavailable, or uncooperative." (Emphasis added.) *Barnslater*, 373 Ill. App. 3d at 523-24. The application of this rule, however, is more nuanced than the State admits.

¶ 98    This rule appears to have originated with *Barnslater* and another First District case, *Collier*, 387 Ill. App. 3d at 637, and it has been cited with approval by the Second, Third, and Fourth Districts, though it has not been cited by our supreme court. See, *e.g.*, *People v. Montes*, 2015 IL App (2d) 140485, ¶ 24; *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21; *People v. Coleman*, 381 Ill. App. 3d 561, 568 (2008) (Third District). Interestingly, both *Barnslater* and *Collier*, in turn, cite *People v. Moleterno*, 254 Ill. App. 3d 615, 625 (1993), in support of the rule. However, the facts of *Moleterno*, not to mention a variety of other cases, demonstrate that the rule cannot be applied rigidly.

¶ 99    In *Moleterno*, the defendant was convicted of first degree murder for shooting the victim during a road rage incident. *Id.* at 617. The defendant alleged self-defense. *Id.* at 618. A citizen who witnessed the incident contradicted the defendant's self-defense theory. *Id.* at 617. The citizen testified that the defendant's gun was chrome colored. *Id.*

¶ 100    In a postconviction petition, the defendant alleged that, *inter alia*, he was entitled to a new trial based on newly discovered evidence. *Id.* at 619. That evidence was the physical gun. The gun was not chrome as the citizen had testified, but black. *Id.* The defendant argued that, if he had been able to impeach the citizen at trial as to the color of the gun, that would have undermined the citizen's account of the incident and changed the outcome of the trial. *Id.* at 623. According to several affidavits, the gun had not been available at trial because the defendant gave the gun to his wife, who gave the gun to their friend for disposal. *Id.* at 619-20. The friend put the gun behind his furnace, where it remained through the trial. *Id.* The defendant, at some point prior to trial, asked for the gun to be returned but, according to the defendant, the friend refused. *Id.* at 620.

¶ 101    The trial court dismissed the postconviction petition at stage two, and the appellate court affirmed. *Id.* at 620, 624-25. Primarily, it reasoned that the color of the gun had not been a material issue at trial, and it was unlikely that impeaching the citizen on a minor point would have changed the outcome of the trial. *Id.* at 624. Secondarily, it reasoned that the gun could not be considered newly discovered evidence where the defendant played an integral role in its unavailability, the defendant did not subpoena his friend to testify to its color and whereabouts, and neither the defendant's wife nor the defendant himself (who had elected to testify at trial) testified to the color of the gun. *Id.* at 625. The court explained:

    "[A]llowing a new trial based on evidence of which the defendant was aware and which he caused to be hidden would be contrary to the very concerns underlying the requirement that courts give such requests close scrutiny. [Citations.] It would be incongruous, to say the least, to allow defendant to bury a piece of evidence within his control, take his chances at trial, and then if convicted, unearth the very same evidence and ask for a second chance." *Id.* at 626.

¶ 102    The *Moleterno* court essentially determined that the evidence was not *truly* unavailable because the defendant could have subpoenaed his friend to testify to the color of the gun and reveal its location and either the defendant's wife or the defendant could have testified to the color. To the extent that the evidence *could* be considered unavailable, the defendant himself caused it to be so. In that unique circumstance, the defendant could not cite the unavailability of the evidence as a basis for a new trial.

¶ 103    We note that the language of the *Barnslater* rule itself, which affirmatively states that it does not matter whether the witness was *unavailable*, outright conflicts with the oft-cited principle that evidence is newly discovered if it was *unavailable* at trial and could not have been discovered earlier through the exercise of due diligence. See *Burrows*, 172 Ill. 2d at 180 (newly discovered evidence is that which "was *not available* at the defendant's trial and which the defendant could not have discovered sooner through the exercise of due diligence" (emphasis added)); see also *Edwards*, 2012 IL 111711, ¶ 34 (citing *Harris*, 206 Ill. 2d at 301). At least one other appellate decision, *People v. Brown*, 2020 IL App (1st) 190828, ¶ 60, has called attention to this discrepancy. In *Brown*, the State, citing the *Barnslater* rule, argued that a witness's unavailability at trial did not render her testimony at the evidentiary hearing new for the purpose of an actual-innocence claim because the witness was aware of the underlying facts prior to trial. *Id.* The *Brown* court, citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984), and *Edwards*, explained that the *Barnslater* rule should not be used to disqualify new evidence where the witness had been "*genuinely* unavailable" at trial. (Emphasis added.) *Brown*, 2020 IL App (1st) 190828, ¶¶ 61-62. Such instances include where a witness invokes or could have invoked a fifth amendment right (*Molstad*) or where the defendant causes a subpoena to be issued against the reluctant witness who still, for whatever reason, fails to testify (*Edwards*). *Id.*

¶ 104    Adding to the exceptions set forth in *Brown*, *Molstad*, and *Edwards*, we note that other appellate decisions, including *Barnslater* itself, have recognized an exception to the rule where the evidence involves recanted testimony. *Barnslater*, 373 Ill. App. 3d at 524. That exception applies only if the defendant did not have evidence available at the time of trial to demonstrate that the witness was lying. *Id.*

¶ 105    While the *Barnslater* rule is more nuanced than the State admits, it remains that a defendant who is aware of the information at issue prior to trial faces a significant hurdle in demonstrating that the evidence was, nevertheless, *genuinely* unavailable to him. Still, as detailed above, defendant's prior awareness that Vilayhong was the shooter is not *per se* fatal to his actual innocence. With this in mind, we proceed to address the newly discovered prong as to each of the three affiants.

¶ 106                            a. Vilayhong's Unavailability

¶ 107    The question of Vilayhong's unavailability to testify for defendant at his trial turns on Vilayhong's fifth amendment right against self-incrimination. It is generally accepted that witnesses are deemed unavailable when they invoke their fifth amendment privilege against self-incrimination. See *Molstad*, 101 Ill. 2d at 135 (in the context of a motion for a new trial). No amount of due diligence can force a witness to testify in violation of his fifth amendment right to avoid self-incrimination. *Id.* The supreme court has applied this principle in the context of postconviction proceedings. See *Edwards*, 2012 IL 111711, ¶ 38. Countless cases have followed suit. See, *e.g.*, *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 54; see also *People v. Henderson*, 2014 IL App (2d) 121219 (the victim was deemed unavailable at trial where he invoked his fifth amendment privilege against self-incrimination).

¶ 108    In *Molstad*, the defendant was convicted of aggravated battery and criminal damage to property. *Molstad*, 101 Ill. 2d at 130. He was alleged to have been part of a group of 8 to 10 individuals who forced a car to stop and attacked it with baseball bats and lead pipes. *Id.* at 131. Two occurrence witnesses testified at the trial—one testified that the defendant

- 15 -

participated in the attack and the other was unable to identify the defendant. *Id.* at 131-32. The defendant denied that he was present during the attack, and he presented an alibi defense. *Id.* at 132. The codefendants did not testify or present a defense. *Id.*

¶ 109    The defendant filed a posttrial motion, offering the affidavits of five of the convicted codefendants, each of whom averred that the defendant had not been present. *Id.* The defendant argued that this evidence was not available at the time of the trial because, in order to give competent testimony that the defendant was not present during the attack, the codefendants would have had to admit that they were present. *Id.*

¶ 110    The supreme court agreed that the evidence was not available at the time of the trial. *Id.* at 134. It rejected the State's argument that the evidence was not newly discovered because the defendant knew of the evidence before the trial. *Id.* It explained:

> "The testimony of Molstad's codefendants clearly qualifies as newly discovered evidence.
>
>     The affidavits submitted as the basis for a new trial could not have been discovered with the exercise of due diligence. The record reveals that the defendants were acquainted with each other, and presumably due diligence on the part of Molstad or his counsel could have ascertained what posture the codefendants would have taken at trial. However, no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination [citation] if the codefendants did not choose to do so." *Id.* at 135.

¶ 111    We reject the State's argument that Vilayhong was no longer protected by the fifth amendment because he had already pleaded guilty under an accountability theory. A defendant's fifth amendment privilege against self-incrimination extends through the sentencing hearing. *People v. Swank*, 344 Ill. App. 3d 738, 744 (2003). This is true whether the defendant maintains his innocence following a trial or whether the defendant pled guilty: " 'Treating a guilty plea as a waiver of the [fifth amendment] privilege at sentencing would be a grave encroachment on the rights of defendants.' " *Id.* at 745 (quoting *Mitchell v. United States*, 526 U.S. 314, 324 (1999)).

¶ 112    Nor is the State's reliance on *People v. Dmitriyev*, 302 Ill. App. 3d 814, 817 (1998), availing. *Dmitriyev* does observe, as the State urges, that "[g]enerally, once a defendant has entered a plea of guilty, he waives his right against compulsory self-incrimination." *Id.* However, the State ignores that, immediately following this quote, the *Dmitriyev* court went on to provide circumstances where a defendant's right against self-incrimination would extend beyond the entry of a guilty plea. *Id.* Those circumstances included (1) during the 30-day period in which a defendant may withdraw a guilty plea, (2) *when the defendant awaited sentencing*, and (3) when the defendant's posttrial motions and/or appeal remained pending. *Id.* (citing *People v. Morales*, 102 Ill. App. 3d 900, 904-05 (1981) (circumstance one), and *People ex rel. Kunce v. Hogan*, 37 Ill. App. 3d 673, 678 (1976) (circumstances two and three)). Thus, rather than conflict with the principle that a defendant's right against self-incrimination extends at least through sentencing, *Dmitriyev* emphatically supports it.

¶ 113    Also, to the extent the State suggests that Vilayhong was effectively sentenced as of defendant's trial, we disagree. Vilayhong's sentence was not finalized until after defendant's trial, and his receipt of the reduced 20-year sentence depended on his testimony that defendant was the shooter.

¶ 114    Similarly, we reject the State's argument that Vilayhong "did not fear incriminating himself," as demonstrated by the fact that Vilayhong pled guilty under an accountability theory. With this argument, the State appears to posit that, given Vilayhong's fearless attitude, defendant should have been able to procure Vilayhong's confession at trial. This argument is not persuasive. Clearly, the defendant who personally discharges the firearm is subject to a harsher penalty than the defendant who pleads guilty under an accountability theory. The difference is codified in the sentencing enhancement provisions for first degree murder. See 730 ILCS 5/5-8-1(a)(1)(d) (West 2008). Indeed, Vilayhong testified at defendant's trial that he felt relieved that he was not facing the "shooter spot."

¶ 115    In sum, no amount of diligence could have forced Vilayhong to testify at the trial that he, and not defendant, was the shooter. As such, Vilayhong was unavailable to testify for defendant and his affidavit qualifies as newly discovered evidence.

¶ 116                              b. Perez-Gonzalez's Unavailability

¶ 117    The question of Perez-Gonzalez's availability turns on whether he absolutely refused to testify at defendant's trial, such that no amount of diligence could have compelled him to do so. The State does not dispute the principle that, in certain circumstances, a witness's refusal to testify may render the witness unavailable. See *Edwards*, 2012 IL 111711, ¶ 37. Rather, it argues that, when Perez-Gonzalez refused to testify, defendant, through trial counsel, should have attempted to interview Perez-Gonzalez and/or should have subpoenaed him to testify for the defense. The trial court also adopted this position.

¶ 118    Per *Edwards*, we disagree that those actions were necessary. In *Edwards*, the defendant moved for leave to file a fourth postconviction petition, which the trial court denied and which became the subject of the appeal. *Id.* ¶ 14. The defendant attached to the petition the affidavits of two alibi witnesses, a mother and daughter, who averred that defendant, then age 15, was with them at the time of the shooting. *Id.* ¶ 12. The alibi witnesses also averred that they had rejected defense counsel's attempts to persuade them to testify at trial. *Id.* They did not want to get involved because some of their family members had been implicated in the case. *Id.*

¶ 119    The supreme court, in affirming the denial, rejected the defendant's argument that the evidence was unavailable to him because he had contacted the alibi witnesses prior to trial but they refused to testify. *Id.* ¶ 37. The court explained:

    "We do not conclude that such evidence could never be considered unavailable where, as here, the witnesses rejected the petitioner's attempts to persuade them to testify. In this instance, however, where there was no attempt to subpoena [the two alibi witnesses], and no explanation as to why subpoenas were not issued, the efforts expended were insufficient to satisfy the due diligence requirement." *Id.*

¶ 120    Thus, the *Edwards* court qualified its opinion by acknowledging that, in different circumstances, a witness's refusal to testify could render the witness unavailable. It simply could not find that the defendant before it had exercised due diligence where he failed to respond to the witnesses' refusal to testify in an obvious manner, *i.e.*, with a subpoena.

¶ 121    Returning to the instant case, we do not agree with the State's rationale that, because defendant did not subpoena Perez-Gonzalez, he cannot have exercised due diligence. Rather, we determine that the instant case presents just the sort of different circumstance envisioned by the *Edwards* court.

¶ 122     That is, at the October 2011 status hearing, Perez-Gonzalez, while represented by counsel, stood before the trial court and informed the court that he refused to testify at defendant's upcoming trial. So firm was Perez-Gonzalez's refusal that he was willing to accept an additional 15 years' imprisonment for first degree murder as well as a to-be-determined punishment for criminal contempt (ultimately, an additional 10 years, for a total of 45 years' imprisonment). As set forth in the postconviction petition, and as is apparent from the record, trial counsel was present at the October 2011 hearing and was, therefore, aware of Perez-Gonzalez's firm and absolute refusal notwithstanding that it meant at least 15 more years of imprisonment. Under these circumstances, any attempt by trial counsel to cause a subpoena to issue would have been an exercise in futility. As stated, Perez-Gonzalez did appear before the court, he refused to answer any substantive questions, and he was willing to accept additional punishment rather than testify. We fail to see what more could have been done to compel Perez-Gonzalez to testify at defendant's trial. Perez-Gonzalez was not available, and no amount of diligence could have forced him to testify.

¶ 123                              c. Garza's Unavailability

¶ 124     Finally, we address whether the information contained in Garza's affidavit was newly discovered. The State appears to concede that defendant did not know that Vilayhong told Garza to dispose of the gun and to lie to the police as to the identity of the shooter. The question remains, however, whether defendant could have learned this information through the exercise of due diligence and could have compelled Garza to testify to this information.

¶ 125     The affidavits indicate that defendant could not have learned this information had he exercised due diligence. Defendant attested in his affidavit that he had read the discovery in his case prior to trial and had learned that Garza spoke with the police. As Garza attested in *his* affidavit, Garza told the police that he saw defendant with a gun before the shooting incident, he met with Vilayhong and defendant "about the gun," and defendant told him that he was the shooter. Therefore, all defendant knew prior to trial was that Garza identified defendant as the shooter.

¶ 126     Similarly, the affidavits indicate that Garza was not available to testify. The supreme court has held that a witness's legitimate fear of a gang retaliation may, in certain circumstances, be sufficient to deem that witness unavailable to testify at trial. See, *e.g.*, *People v. Ortiz*, 235 Ill. 2d 319, 327, 334 (2009) (the witness was unavailable to testify at trial, where he did not go to police in fear of gang retaliation and subsequently moved out of state). Here, Garza attested that he obeyed Vilayhong's order to lie to police because he feared a gang retaliation. As in *Ortiz*, he then moved to another state for "a couple of" years to escape the fear and pressure that he felt. The information contained in the other affidavits, as well as the evidence at trial, support Garza's assertion that Vilayhong held rank in the gang and was an "enforcer" capable of executing on a threat. As such, the legitimacy of Garza's fear and whether it rendered him unavailable to testify at trial should be ascertained at an evidentiary hearing.

¶ 127                          2. Material and Noncumulative

¶ 128     We next address the material and noncumulative prong, first considering evidence identifying Vilayhong as the shooter and next considering evidence regarding the disposal of the gun. Again, material means that the evidence is relevant and probative of the defendant's

innocence. *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means that the evidence adds to what the jury heard. *Id.*

¶ 129    The trial court determined that the affidavits identifying Vilayhong as the shooter were material and noncumulative, and we agree. The affidavits identifying Vilayhong as the shooter, and, as a corollary, denying that defendant was the shooter, were highly probative of defendant's innocence. The State prosecuted defendant as the shooter, and it did not pursue an accountability theory at trial. Also, the affidavits identifying Vilayhong as the shooter were noncumulative, as none of the evidence at trial directly implicated Vilayhong as the shooter.

¶ 130    The State argues that the affidavits identifying Vilayhong as the shooter were *not* material because they were "not probative of defendant's innocence." In support, the State asserts that the averments that Vilayhong was the shooter do not exonerate defendant from all involvement in the shooting. The State cites no authority for its position. Rather, the State appears to argue that to present a viable claim of actual innocence the defendant must be innocent of all crimes, not just the crime of which he was convicted. The State advances this position more directly in relation to the conclusive character prong, which we reject below. For now, we observe that the essence of an actual-innocence claim is that the defendant asserts that he is "innocent of the crime for which he has been tried, convicted, and sentenced." *Harris*, 206 Ill. 2d at 301. Also, every defendant has the constitutional right to defend against the theory of guilt upon which he was prosecuted, convicted, and sentenced. *People v. Millsap*, 189 Ill. 2d 155, 164 (2000). Evidence that tends to prove that defendant was not the shooter is clearly material to the theory of guilt upon which defendant was prosecuted, convicted, and sentenced. As noted earlier, the State did not pursue an accountability theory against defendant.

¶ 131    The trial court also determined that the information in Garza's affidavit regarding the disposal of the gun was cumulative of Vilayhong's testimony at trial. We disagree. Vilayhong testified on direct examination that he did *not* know what happened to the gun after the shooting. He testified vaguely on cross-examination that he "think[s]" he told Garza to get rid of the gun. As such, Garza's affidavit, stating that Vilayhong told him to dispose of the gun and providing details concerning the timing of the instruction, is not cumulative to the extent that it adds to what the jury heard.

¶ 132                              3. Conclusive Character

¶ 133    We next address the conclusive character prong. As stated, the new evidence is of a conclusive character if, when considered alongside the trial evidence, a trier of fact would probably reach a different result. *Coleman*, 2013 IL 113307, ¶ 96. The new evidence need not be completely dispositive. *Id.* ¶ 97. Rather, "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* The question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.*; *People v. Robinson*, 2020 IL 123849, ¶ 48. We determine that the new evidence, taken as true at the pleadings stage, satisfies the conclusive character prong.

¶ 134    In Vilayhong's affidavit, he confessed to being the shooter. His confession was consistent with the evidence at trial that he had orchestrated the shooting and had been the only one to yell gang slogans and throw gang signs at the members of the Insane Deuces. In Perez-Gonzalez's affidavit, he identified Vilayhong as the shooter. As the driver, Perez-Gonzalez would have had a view of defendant in the front passenger seat and would have been able to

- 19 -

see that defendant was not the shooter. Perez-Gonzalez's affidavit was especially compelling because he stated that he was willing to accept 15 additional years in prison rather than testify falsely that defendant was the shooter. Still, he was too afraid of gang retaliation to testify that Vilayhong was in fact the shooter. Garza's affidavit stated that Vilayhong confessed to the shooting, told Garza to identify defendant as the shooter, and told Garza to dispose of the gun. Garza's affidavit contained supporting details that were corroborated by details in the other affidavits. For example, Garza stated that he met Vilayhong at a fast-food restaurant and Perez-Gonzalez stated that Garza met the group at Burger King.

¶ 135    We consider this evidence alongside the evidence at trial. The main evidence at trial supporting defendant's conviction as the shooter was as follows. Vilayhong and Gonzalez testified that defendant sat in the Expedition's front passenger seat. Almanza testified that the Expedition's front passenger window was open and she saw a flash coming from that window. Vilayhong and Gonzalez testified that Vilayhong ordered defendant to shoot at the Pontiac or be subject to a gang violation. Vilayhong saw defendant stick his arm out the window, and he heard a shot. Gonzalez saw defendant stick his arm out the front passenger window, and he saw a flash and heard a pop come from defendant's window.

¶ 136    In considering the affidavit evidence alongside the trial evidence, we note certain weaknesses in the State's case. In his initial interview with police, defendant never confessed to the shooting. Almanza and Pellot did not actually see defendant shoot the gun. The Expedition was higher than the Pontiac, and Almanza could not see into it. She could not say for certain whether the back passenger window, where Vilayhong sat, was open. She was in a "daze," having just seen her friend shot. Pellot, the only witness in the shooter's car who did not testify pursuant to an agreement with the State, claimed to have blacked out. Pellot did, however, believe that defendant was sitting in the Expedition's third row, not the front passenger seat. Defendant told police that he sat in the back row.

¶ 137    Moreover, Vilayhong's and Gonzalez's testimony contained inconsistencies that raised credibility questions. Vilayhong testified inconsistently as to when he gave defendant the gun and what happened to the gun after the shooting. Vilayhong also testified that his window was open at the time of the shooting. However, the State's theory of the case was that Vilayhong's window was closed at the time of the shooting. Gonzalez, in turn, testified inconsistently as to whose window was down and when. This was problematic because he testified that only one window was open at the time of the shooting. Almanza was not sure, but she also believed that only one window was open at the time of the shooting. Also, we are mindful that Vilayhong acknowledged that he had a history of mental health issues, had been hospitalized for bipolar manic depression, and no was longer was taking the medication prescribed to him when he left the hospital. It is, of course, also significant that Vilayhong testified against defendant in exchange for a more lenient sentence.

¶ 138    To escape a conclusion that, when considered alongside the trial evidence, the affidavit evidence would probably lead a trier of fact to reach a different result, the State argues that the affidavits (1) are "positively rebutted" by the trial testimony and (2) do not support a theory of actual innocence, in that they do not preclude the State from prosecuting defendant under an accountability theory on retrial. The trial court also adopted these positions.

¶ 139    To support that the affidavits are positively rebutted by the record, the State points to the trial testimony of Vilayhong, Gonzalez, and Pellot. In doing so, the State misconstrues what it means for the evidence at trial to "positively rebut" the new evidence in support of actual

innocence. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60. A comparison of *Sanders*, 2016 IL 118123, and *People v. Harper*, 2013 IL App (1st) 102181, elucidates why the trial evidence here does not "positively rebut" the new evidence in this case.

¶ 140 In *Sanders*, the defendant was granted leave to file a successive postconviction petition asserting actual innocence. The petition was supported by the affidavit of a witness who had testified against the defendant at trial but who now claimed that he, not the defendant, shot the victim. *Sanders*, 2016 IL 118123, ¶ 48. Specifically, the witness averred that he shot the victim *just once*. *Id.* However, the pathologist who performed the autopsy had testified at trial that the victim was shot twice in the back of the head and that the cause of death was *multiple gunshot wounds*. *Id.* As such, the supreme court determined that the evidence at trial positively rebutted the new evidence in support of actual innocence. See *id.*

¶ 141 In *Harper*, the court granted the defendant leave to file a successive postconviction petition asserting actual innocence that was supported in part by the affidavit of a man who confessed to setting the fire for which the defendant had been convicted. *Harper*, 2013 IL App (1st) 102181, ¶¶ 37, 41. The affiant claimed to have kicked in the back door to gain entry. *Id.* ¶ 44. The trial court subsequently dismissed the petition at stage two for a variety of reasons, including that the affidavit was not of such a conclusive character that it would probably change the result on retrial. *Id.* ¶ 27. On appeal, the State argued that the dismissal was proper because the affiant's confession was positively rebutted by the defendant's earlier confession. *Id.* ¶ 44. It also argued that the affiant's claim that he kicked in the back door to gain entry was positively rebutted by physical evidence at trial that a backdraft explosion had occurred due to an oxygen-deprived environment. *Id.* The appellate court disagreed and reversed the dismissal, noting that, at the second stage, it was improper to engage in a credibility determination as to whether the affiant's confession or the defendant's confession was more believable. *Id.* Similarly, the physical evidence of the backdraft was not so conclusive as to positively rebut the affiant's assertion that he kicked in the back door. *Id.* The court explained that these sorts of credibility and factual determinations are not appropriate at stage two and are best reserved for a stage-three evidentiary hearing. *Id.*

¶ 142 The instant case is more analogous to *Harper* than to *Sanders*. Here, unlike in *Sanders*, none of the evidence demonstrates that any of the affidavits were false. For example, Vilayhong's trial testimony does not positively rebut his recantation. Instead, it must be determined at an evidentiary hearing whether Vilayhong's recantation is credible enough to warrant a new trial. Similarly, Gonzalez's trial testimony that defendant complied with Vilayhong's order to shoot at the Pontiac is not sufficient to positively rebut the new evidence. While Vilayhong's and Gonzalez's trial testimony conflicts with their affidavits, this is not the same as positively rebutting the affidavits. See, *e.g.*, *Robinson*, 2020 IL 123849, ¶ 60 ("a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted"). Finally, Pellot's initial statement to police is not sufficient to positively rebut the new evidence. Pellot's initial statement to police that defendant complied with Vilayhong's order to shoot was *itself* in conflict with Pellot's trial testimony that he blacked out and could not remember the shooting.

¶ 143 Simply put, none of the trial testimony urged by the State positively rebuts the affidavit evidence, and it certainly does not approach the certitude of the pathologist's gunshot-wound

testimony in *Sanders*. To hold otherwise would require credibility and factual determinations that are inappropriate at the pleadings stage.

¶ 144 The State also argues that the affidavits are not conclusive because they do not support a theory of actual innocence, *i.e.*, they do not preclude the State from prosecuting defendant for first degree murder under an accountability theory on retrial. In support of this argument, which might be characterized as a "total vindication or exoneration" argument, the State directs us to *People v. Rivera*, 2016 IL App (1st) 132573, ¶¶ 30-32. While *Rivera* does indeed support the State's position, we note that the *Rivera* court relied upon an outdated understanding of actual innocence claims, which has recently been rejected by the supreme court in *Robinson*, 2020 IL 123849, ¶¶ 55-56.

¶ 145 In *Rivera*, the State charged and prosecuted the defendant for first degree murder under the theory that he was the shooter in a gang shooting. *Rivera*, 2016 IL App (1st) 132573, ¶¶ 1-2. The evidence presented at trial showed that the defendant was riding in a van with several other gang members when he saw the victim, a man he mistakenly believed to be a member of a rival gang. *Id.* ¶ 2. The defendant and two other gang members, including codefendant John Crowe, exited the van and shots were fired. When the trio returned to the van, the defendant showed the gun to the other gang members and said that he was a " 'Stone killer.' " *Id.* The jury convicted the defendant of first degree murder, and Crowe pled guilty to first degree murder under an accountability theory. *Id.* ¶¶ 3, 6.

¶ 146 Later, the defendant filed a postconviction petition asserting actual innocence and attaching Crowe's affidavit. *Id.* ¶¶ 4-7. In his affidavit, Crowe averred that he, not the defendant, shot the victim. *Id.* ¶ 7. Crowe did not mention whether the defendant was present. *Id.* The trial court dismissed the petition on the pleadings. *Id.* ¶ 15. The appellate court affirmed. It explained that Crowe's affidavit was not of such a conclusive character that it would probably change the result of the trial:

> "Accepting as true Crowe's representation in his affidavit that he, and not defendant, shot the victim, that scenario does not necessarily exonerate defendant. [See *Collier*, 387 Ill. App. 3d at 636.] Although Crowe's affidavit does not say that defendant was present in the van, he does not say defendant was not present. Moreover, the testimony of [other witnesses] places defendant squarely in the middle of these events. [Witness A] testified that defendant and Crowe got out of the van together and returned after shots were fired. Even presuming *arguendo* that Crowe was the gunman, defendant would still be criminally accountable for Crowe's actions." (Emphasis omitted.) *Id.* ¶ 31.

¶ 147 In reaching this conclusion, however, the *Rivera* court relied on subsequently abrogated case law, including *Collier*. Our supreme court in *Robinson* recently made clear that, when considering the conclusive character element, trial courts err where they employ a standard that requires evidence of total vindication or exoneration. *Robinson*, 2020 IL 123849, ¶ 55. To the contrary, the new evidence supporting an actual-innocence claim need not be entirely dispositive to be likely to alter the result on retrial. *Id.* ¶ 56. Again, to be likely to alter the result on retrial, "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.*

¶ 148 In rejecting the "total vindication or exoneration" standard, the *Robinson* court noted that it was abrogating two appellate decisions—*Collier*, relied upon by the *Rivera* court, and

*Barnslater*, 373 Ill. App. 3d 512, relied upon by the trial court in the instant case. The *Robinson* court expressly stated that *Collier* and *Barnslater* had relied upon an improper reading of *People v. Savory*, 197 Ill. 2d 203, 213 (2001), which had also rejected the total vindication or exoneration standard. *Robinson*, 2020 IL 123849, ¶ 55. Although numerous appellate decisions have applied the total vindication or exoneration standard, we no longer do so, consistent with the supreme court's pronouncement in *Robinson*.

¶ 149    Accordingly, we reject the State's position that a defendant who is prosecuted, convicted, and sentenced as the principal/shooter cannot make an actual innocence claim by showing that another person shot the victim, notwithstanding that the defendant *might* have been prosecuted under a theory of accountability. Every defendant has a constitutional right to defend against the theory of guilt upon which he was *actually* convicted and sentenced. See *Millsap*, 189 Ill. 2d at 164. To dismiss an actual innocence claim on a theory of accountability that was never presented to the factfinder violates this principle.

¶ 150                         C. Ineffective Assistance of Appellate Counsel

¶ 151    Defendant argues that appellate counsel provided ineffective assistance by failing to (1) argue that the trial court committed plain error by failing to respond in the negative to the jury's question, "If a person is in a vehicle when a felony occurs can they be charged with that felony?" and (2) challenge the sufficiency of the evidence.

¶ 152    Claims of ineffective assistance of appellate counsel are evaluated under the *Strickland* test. *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The *Strickland* test provides that the defendant must show both that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. In the context of a claim against appellate counsel, the defendant must show that counsel's failure to raise an issue was objectively unreasonable and that he was prejudiced by counsel's choice. *Enis*, 194 Ill. 2d at 377.

¶ 153                                    1. Jury Question

¶ 154    We first address the trial court's answer to the jury's question. We note that, here, trial counsel failed to object contemporaneously to the court's proposed answer, though he did raise it in an unsuccessful posttrial motion. Additionally, the State argues that trial counsel actively acquiesced in the trial court's nonresponse, encouraging it to refrain from providing an instruction on the issue of accountability. As such, to challenge the court's answer, appellate counsel would, at a minimum, have had to overcome the doctrine of forfeiture and potentially invited error if the State's acquiescence argument is correct. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a contemporaneous objection, along with raising the issue in a posttrial motion, is required to preserve an issue for review); *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44 (the invited-error doctrine precludes a defendant from actively acquiescing in an action taken by the trial court and then later claiming that the action was error).

¶ 155    To overcome forfeiture, a defendant must show that a plain error occurred. See *People v. Hood*, 2016 IL 118581, ¶ 18. To show plain error, a defendant must show that a clear or obvious error occurred and that (1) the evidence was closely balanced, regardless of the seriousness of the error, or (2) the error was so serious that it undermined the fairness of the

trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* Even when a defendant shows plain error, he may be foreclosed from obtaining relief if he actively participated in the error as a matter of trial strategy. *Holloway*, 2019 IL App (2d) 170551, ¶ 44. In this way, invited error differs from mere forfeiture. *Id.*

> "To allow the defendant to use a ruling or action that he secured at trial as the basis of a reversal on appeal would be unfair to the State and encourage defendants to become duplicitous. [Citation.] Thus, invited error does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." *Id.*

¶ 156    As to the threshold question of whether plain and obvious error occurred, we start with the proposition that jurors are generally entitled to have their questions answered. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). When the jury asks a question on a point of law, when the original instructions are incomplete, or when the jurors are manifestly confused, the court has a duty to answer the question and clarify the issue in the minds of the jurors. *Id.* However, in its discretion, the court may refrain from answering the jury's question in certain circumstances. *Id.* These circumstances include when the question is one of fact, when the existing jury instructions are readily understandable and sufficiently explain the law, when further instruction could mislead the jury, or when answering the question could potentially direct the verdict. *Id.* Also, courts should exercise caution when the jury's question is ambiguous and should avoid any response to the question that may require "a colloquy between the court and the jury, a further explanation of the facts, and perhaps an expression of the trial court's opinion on the evidence." (Internal quotation marks omitted.) *Id.* at 39-40.

¶ 157    Here, again, the jury asked: "Clarification of first[-]degree murder. If a person is in a vehicle when a felony occurs, can they be charged with that felony?" The trial court answered: "You have received the appropriate instruction on the elements of the offense charged which is first degree murder. The instruction given is the appropriate instruction." Defendant acquiesced to the court's answer, but he now argues that the trial court should have answered: "No."

¶ 158    We conclude that, because the jury instructions were readily understandable and sufficiently explained the law governing the jury's question, the trial court's answer to the question was not an abuse of discretion. Accordingly, appellate counsel's decision not to challenge it as an error was reasonable. In fact, we see no qualitative difference between the court's given answer to review the instructions for first degree murder and defendant's proffered answer of "no."

¶ 159    The jury asked for a clarification of first degree murder, only. The court's answer concerned first degree murder, only: "You have received the appropriate instruction on the elements of the offense charged which is first degree murder. The instruction given is the appropriate instruction." To the extent that the jury thereafter elected to review the first degree murder instructions, it would have been reminded that

> "[a] person commits the offense of first[-]degree murder when he kills an individual if, *in performing the acts which cause the death*, he intends to kill or do great bodily harm to that individual or another, or he knows that such acts create a strong probability of death or great bodily harm to that individual or another." (Emphasis added.)

A plain reading of the instructions, which requires the State to prove beyond a reasonable doubt that defendant performed the acts causing the victim's death, itself clarifies that mere presence in a vehicle is not sufficient to sustain a conviction of first degree murder.

¶ 160    The case upon which defendant relies, *People v. Flynn*, 172 Ill. App. 3d 318 (1988), is inapposite. In *Flynn*, the jury asked why only four of the five charges went to trial and why the codefendant did not testify. *Id.* at 323. The trial court declined to provide substantive answers to the questions. *Id.* The appellate court determined that failing to answer the jury's questions—by explaining the concept of *nolle prosequi* and that a codefendant has a fifth amendment right not to testify—left the jury to infer that defendant pleaded guilty to the fifth charge and that the codefendant was not called to testify because his testimony would have been damaging to the defendant. *Id.* at 323-24. The court concluded that the trial court's failure to clarify the jury's confusion on a point of law deprived the defendant of a fair trial and constituted plain error. *Id.* at 324. Here, in contrast, the trial court directed the jury to the given first degree murder instructions, which, as discussed, correctly answered the jury's mere presence question.

¶ 161    Defendant argues that the trial court's answer to the question was nevertheless unreasonable because it failed to resolve the jury's confusion over the interplay between the first degree murder instructions and the special interrogatory. Defendant points to the jury's *subsequent* finding of guilt and its negative answer to the special interrogatory to support his position that the jury's question necessarily concerned the interplay between the first degree murder instruction and the special interrogatory. However, at the time the jury asked the question, it was not at all apparent that their question concerned this interplay. To reach this conclusion, the court would have had to engage in a colloquy, a practice which is discouraged. See *Reid*, 136 Ill. 2d at 39-40.

¶ 162    Indeed, trial counsel's original assessment of the question was that it concerned accountability or mere presence, but *not* necessarily that it implicated the special interrogatory. ("[A]pparently they're asking almost on accountability[/]mere presence.") Trial counsel was opposed to giving a substantive instruction on accountability because that theory was not presented at trial. ("I don't know [about] giving them additional law on that. He was not charged under the accountability theory, and that was not argued so I'm not sure that instruction should go back.") Trial counsel's initial assessment was consistent with *Millsap*, which held that a court may not submit new theories to the jury after the jury commences deliberation. *Millsap*, 189 Ill. 2d at 165. Rather than impermissibly instruct the jury on a new theory, it was appropriate to inform the jury to return to the instructions given. *Id.*

¶ 163    Nor is defendant's reliance on *People v. Peoples*, 2015 IL App (1st) 121717, availing. In *Peoples*, the State prosecuted the defendant for first degree murder under the theory that the defendant was the shooter. *Id.* ¶ 3. It did not present an accountability theory. *Id.* The jury was given instructions for first degree murder, as well as a special interrogatory for the purpose of a sentencing enhancement, which asked whether the State proved beyond a reasonable doubt that the defendant personally discharged the firearm that caused the victim's death. During deliberations, the jury asked: " 'Can someone be guilty of first degree murder [and] not pull the trigger? We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves James Peoples was the shooter. Your assistance is most welcome!' " *Id.* ¶ 52. The trial court, over trial counsel's objection, answered " 'Yes.' " *Id.* ¶ 53. The jury subsequently returned a general verdict of guilty of first degree murder but

answered the special interrogatory in the negative, finding that the State did not prove beyond a reasonable doubt that the defendant personally discharged the firearm that caused the victim's death. *Id.* ¶ 55.

¶ 164 The appellate court held that the trial court committed reversible error in answering the jury's question in the affirmative. *Id.* ¶ 97. By answering "yes," the trial court effectively instructed the jury that it could convict based on a theory of accountability. *Id.* However, a court may not submit new theories to the jury after it commences deliberation. *Id.* ¶ 94 (citing *Millsap*, 189 Ill. 2d at 165). Doing so raises the serious possibility that the defendant will be convicted on a theory that he never had an opportunity to contest, thereby depriving him of his right to a fair trial. *Id.* ¶¶ 93-94. Accountability was not a theory pursued at the trial, so, under the circumstances of the case, the correct answer to the jury's question was "no." *Id.*

¶ 165 Initially, we observe that *Peoples* is distinguishable because the jury's question specifically referred to its confusion over the interplay between the instructions for first degree murder and the special interrogatory. ("We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves James Peoples was the shooter.") Unlike in the instant case, the *Peoples* court would not have needed to engage in a colloquy with the jury to discern this. See *Reid*, 136 Ill. 2d at 39-40 (courts should exercise caution when the jury's question is ambiguous and should avoid any response to the question that may require "a colloquy between the court and the jury" (internal quotation marks omitted)).

¶ 166 The more significant distinction, of course, is that the defendant in *Peoples* was prejudiced because the trial court's incorrect answer impermissibly injected a new prosecution theory to the defendant's detriment. Here, defendant does not allege that he was prejudiced because the trial court provided an *incorrect* answer. Rather, defendant argues that he was prejudiced because "the trial court's refusal to settle the jury's confusion about accountability *improperly suggested* to the jury that it could convict [defendant] based on accountability." (Emphasis added.) We disagree with this assertion. As discussed, the trial court's direction to review the instructions for first degree murder, which provided that defendant needed to have performed the acts that caused the death, was sufficient to inform the jury that mere presence in the vehicle could not substantiate a first degree murder conviction.

¶ 167 In sum, the trial court's answer to the jury's question was not error. Accordingly, appellate counsel provided reasonable assistance in declining to challenge the trial court's response to the jury's question.

¶ 168                                                2. Sufficiency of the Evidence

¶ 169 The entirety of defendant's argument concerning the sufficiency of the evidence reads as follows:

> "Further, Petitioner was also prejudiced by appellate counsel's failure to challenge the sufficiency of the evidence. The jury found that the State failed to prove that Defendant personally discharged the weapon. But defendant's personal firing of the gun was the sole theory on which the murder charge was based. Thus, if that allegation was not proven, the jury was required to acquit on the murder charge."

¶ 170 Defendant's argument is forfeited pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). Rule 341(h)(7) requires an appellant to adequately develop his or her argument with citation to relevant authority. *Id.* This court is "entitled to have issues clearly defined with

pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Failure to comply with Rule 341(h)(7) may result in forfeiture. *People v. Ward*, 215 Ill. 2d 317, 332 (2005) (a point raised in the brief but not supported by citation to relevant authority is forfeited); *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 (plaintiff's argument, which consisted of two conclusory paragraphs, was forfeited for failure to comply with Rule 341(h)(7)). Here, defendant's argument consists of one conclusory paragraph. Forfeiture is, therefore, appropriate.

¶ 171　　Forfeiture aside, defendant's argument ignores a host of cases holding that a special interrogatory that is inconsistent with a general verdict of guilt does not provide a basis to challenge the general verdict. See, *e.g.*, *People v. Ware*, 2019 IL App (1st) 160989, ¶ 55; *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 38; *Reed*, 396 Ill. App. 3d at 646-48. These cases provide that, while the inconsistency itself does not provide a basis to challenge the general verdict of guilt, a defendant may always otherwise challenge the sufficiency of the evidence supporting the general verdict of guilt as a check against jury irrationality. *Reed*, 396 Ill. App. 3d at 648. A sufficiency challenge is independent of any interplay between the general verdict and the special interrogatory. See, *e.g.*, *id.* at 649 ("the alleged inconsistent answer to the special interrogatory is not part of the sufficiency-of-the-evidence analysis"). Standing alone, the inconsistency does not, as defendant argues, in any way demonstrate that the evidence was insufficient.

¶ 172　　With that in mind, we note that the evidence was clearly sufficient to convict. When reviewing a sufficiency claim, the question for this court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). We defer to the trier of fact on matters of witness credibility and the weight to be afforded to the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Here, among other evidence, Vilayhong and Gonzalez, who were present in the vehicle, each testified that defendant shot the victim. The testimony of a single witness, if believed, is sufficient to sustain a conviction. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We recognize that Vilayhong and Gonzalez each testified pursuant to an agreement with the State. However, the jury was made aware of this, and it was up to the jury to decide Vilayhong's and Gonzalez's credibility. Appellate counsel was not ineffective for failing to challenge the sufficiency of the evidence.

¶ 173　　　　　　　　　　　　　　　III. CONCLUSION

¶ 174　　The judgment of the circuit court of Kane County is reversed, and the cause is remanded for a stage-three hearing on defendant's actual innocence claim.

¶ 175　　Reversed and remanded.