2022 IL App (2d) 200074-U
No. 2-20-0074
Order filed February 17, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-1909 |
| JUAN M. CUELLAR, | ) ) ) | Honorable Jeffrey S. MacKay, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in second-stage dismissal of defendant's postconviction petition seeking relief, on actual-innocence grounds, from his conviction of first-degree murder for the shooting death of the victim. Defendant produced his mother's affidavit stating that, if called as a witness, she would testify that defendant told her that he shot the victim because he saw an object on the victim that he believed was a gun. However, even if the mother's affidavit was newly discovered evidence, it failed to meet the remaining elements of an actual-innocence claim. For instance, at most, the affidavit supported defendant's claim that he subjectively believed that force was required; it did not contradict the trial evidence that defendant was the initial aggressor and that the victim made no threat of force against defendant.

¶ 2    Defendant, Juan M. Cuellar, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) for the shooting death of Joshua Holmes on September 24, 2012. He appeals the second-stage dismissal of his petition filed under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)), which alleged, among other things, a claim of actual innocence based on self-defense. Defendant had testified at trial that he believed that Holmes had a gun but did not actually see Holmes with a gun before the shooting. Defendant included with his petition the affidavit of his mother, Elva Hernandez, stating that defendant told her that, before the shooting, he saw Holmes with an object that appeared to be a gun. Defendant contends that the evidence was (1) newly discovered (because Elva was unavailable to testify at trial), (2) material, (3) noncumulative, and (4) of such a conclusive character that it would probably change the result on retrial. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                      A. Trial

¶ 5                              1. September 6, 2012, Incident

¶ 6    Defendant's jury trial occurred in April 2015. Witnesses testified to the shooting of Holmes on September 24, 2012, and to an earlier incident on September 6, 2012.

¶ 7    Emanuel Oliver, a friend of Holmes, testified that he was with Holmes on September 6, 2012, when defendant and defendant's younger brother, Christopher Hernandez, came up to them outside of an apartment complex. Defendant asked Holmes for money that he owed Hernandez. Defendant also pulled a clip and a handgun from his pockets, loaded the gun, pointed it at Holmes's face, and said to Hernandez, " 'What are you waiting for?' " Hernandez then threw bricks at Oliver and Holmes, who ran away.

¶ 8    Christina Mitchell testified that, on September 6, 2012, she was on her balcony when she observed a confrontation between two black males and two Hispanic males. One of the Hispanic males pulled out a gun, cocked it, and pointed it at the face of one of the black men. The other Hispanic man retrieved a brick from his sweatshirt. The black men ran, and the Hispanic man threw the brick at them. Both Hispanic men then chased the black men. Mitchell did not see any weapons on either black man.

¶ 9    Testifying for the defense, Hernandez stated that he had given Holmes money for marijuana but never received it. He admitted that he and defendant confronted Holmes on September 6, 2012. Defendant brandished a gun during the incident, and Hernandez threw a brick at Holmes. Hernandez was charged for the incident and pleaded guilty to attempted aggravated battery and unlawful use of a weapon.

¶ 10   Hernandez testified that, a few days after the September 6, 2012, incident, someone threw a brick through the window of the main door to Hernandez's apartment building. The brick looked like the one that Hernandez had thrown at Holmes. A week before the September 24, 2012, shooting, Hernandez saw a gray car pursue him and his family as they drove to the library. Hernandez stated that one individual in the gray car had been with Holmes when Hernandez tried to buy marijuana. Hernandez felt threatened and told defendant about the incident.

¶ 11   Defendant testified that Hernandez told him about his attempt to purchase marijuana from Holmes. Defendant decided that they would confront Holmes. Defendant stated that he did not intend to shoot Holmes; he brought his gun in case he got "jumped." Defendant and Hernandez approached Holmes and Oliver on September 6, 2012. When Holmes said that he did not have Hernandez's money, defendant took out the gun. Defendant put the clip in the gun and cocked it, but he did not have his finger on the trigger and did not point the gun directly at Holmes. After

- 3 -

two to three seconds, he put the gun away and told Hernandez to throw the brick. When Oliver and Holmes ran away, Hernandez chased them until defendant told him to come back.

¶ 12    Defendant testified that, when he and Hernandez returned to defendant's home, defendant told Hernandez that what they did was "completely stupid" and that Hernandez should "let the money go." At the time, defendant "felt like an idiot" and was remorseful. He told Hernandez to stay inside and to call the police "if it got bad." Defendant began staying at his aunt's house in Bensenville because he was fearful of arrest.

¶ 13                              2. September 24, 2012, Shooting

¶ 14    On September 24, 2012, Holmes and group of his friends, including Oliver, Tyler Blake, Antoine Massie, and Andre Fields, went to Baba's, a restaurant in a strip mall. Oliver saw Hernandez inside, working as a cook. Holmes and several others went inside while Oliver waited outside. Blake testified that Holmes and Hernandez made eye contact but did not speak. According to Blake, the group left and went to a nearby McDonald's after someone in the group said that Hernandez might spit in their food.

¶ 15    Hernandez testified that he was working at Baba's on September 24, 2012, when some people came in, looked at him, and laughed, stating, " '[O]h, he works here.' " Later, Holmes arrived with some friends. According to Hernandez, Holmes said to him, " '[S]o you have something for me, right?' " Hernandez did not answer, and Holmes said, " 'Well, I got something for you.' " As he said this, Holmes pulled his pants up with his right hand. Hernandez did not see a weapon but took Holmes's words and gesture to mean that he had one. Holmes then smiled and left with his friends. After telling his manager that he was being bullied, Hernandez called his girlfriend, who then called defendant. Hernandez's girlfriend and Elva came to Baba's, ate, and left.

¶ 16    Oliver testified that, after the group ate at McDonald's, they started walking and saw defendant drive past them, pointing angrily. Oliver then saw defendant's car parked near an intersection. The group began to break up, but Holmes continued walking toward defendant's car without saying anything or making any gestures. Oliver and another in the group tried unsuccessfully to stop Holmes from approaching the car. Oliver testified that, when someone told Holmes, " 'Don't walk to the car,' " Holmes replied, " 'This is not out West.' " Massie testified that Holmes said, " '[T]his is not the city, this the suburbs,' " and, " 'He is about that life.' " Massie further testified that, when he and others told Holmes not to approach defendant because he had a gun, Holmes said that he knew defendant had a gun but did not believe he would use it.

¶ 17    Blake testified that defendant made a signal from his car, and, when Holmes saw it, he swore and said, " 'I'm going to get this guy; I'm going to kick his ass.' " Massie saw Holmes walk faster toward the car and heard him say that he was going to " 'beat them up.' " Oliver testified that he did not see a gun in Holmes's hands or on his person. According to Oliver, Holmes was wearing a hoodie with a front pouch. Oliver did not know what was in the pouch.

¶ 18    Oliver saw Holmes lean into the driver's side window of defendant's car and converse with him. Oliver could not hear what they were saying. Blake testified that he saw Holmes raise his hands from his waist to above his shoulders. Blake did not see Holmes grab his belt, but Blake admitted that he did not see everything Holmes did with his hands. Massie testified that he saw Holmes pull his pants up with both hands three times, as if telling defendant to get out of the car and fight.

¶ 19    Oliver testified that, four or five seconds after Holmes began conversing with defendant at the car window, Oliver heard multiple gunshots. Oliver admitted that he did not "know exactly what was done by either [defendant or Holmes] just prior to the shooting." Oliver and other

witnesses testified that, once the shooting started, they saw Holmes turn and attempt to run but then drop to the ground. Oliver testified that the shots were "right in a row" but there was "hesitation" between a couple of them. Oliver saw defendant drive his vehicle to where Holmes had fallen, get out of his car, and walk over to Holmes. Defendant leaned over Holmes before returning to his car and driving away. Oliver ran to Holmes but left before the police arrived.

¶ 20    Fields testified that he saw defendant "pushing to see if [Holmes] was alive or *** just kicking him, whatever the case may be." Then, according to Fields, defendant attempted to shoot Holmes again, but he was out of bullets and got in his car and left.

¶ 21    Kara Collins, the mother of defendant's son, testified under a grant of use immunity. Two weeks before the shooting, defendant told her about the September 6, 2012, incident. On September 24, 2012, at just after 7 p.m., Collins received a phone call from defendant. Collins met defendant at his aunt's house. Defendant told Collins that he had received a call about people outside of Hernandez's place of work and was asked to check on Hernandez. Defendant told Collins that, when he went to Hernandez's place of work, he saw "a couple [of] guys" and "squealed his tires to try to scare them off." Most of the men fled. However, Holmes, whom defendant referred to as "Savage," approached defendant and yelled something like, " 'Do you have a problem?' " or " 'Hey what's up?' " Holmes then "grabbed his pants and stood there." Defendant "unloaded a clip" at Holmes out of the car window. Defendant got out of his car, walked up to Holmes, and pointed the gun at him. He did not shoot again because Holmes's body was convulsing and "he kind of had a feeling he was dead." Defendant asked, " 'Have you had enough?' " and "then got in his car and left." Defendant did not mention to Collins that Holmes had a gun during the incident.

¶ 22    Collins testified that later defendant told the story again to Collins, Elva, and Elva's husband. Some of the conversation was in Spanish, and Collins could not understand those portions. Collins did not hear defendant say that he saw Holmes with a gun. Defendant talked about getting rid of the gun he used in the shooting. Elva told him to throw it in the Fox River and leave for Mexico. Defendant and Derek Van Balen, who was Collins's mother's boyfriend, filed off the serial numbers from the gun, and defendant wiped down the bullets with alcohol. Collins helped defendant duct-tape a dumbbell to a gun case. Collins then drove defendant, Hernandez, Elva, and Hernandez's girlfriend to dispose of the items. During the ride, defendant repeated his account of the shooting. Defendant did not say that he saw Holmes with a gun or other weapon before defendant shot him. Rather, defendant and the others "were talking about whether [Holmes] may or may not have" had a weapon on him. Defendant threw a white plastic bag (Collins did not know what was inside) into the river at one spot and threw the gun case into the river at another spot. Collins then drove to a park, where defendant threw the bullets down one of the sewer openings.

¶ 23    Van Balen also testified under a grant of use immunity. He corroborated Collins's testimony about helping defendant remove the serial numbers from defendant's gun and wiping the bullets with rubbing alcohol. In addition, Van Balen stated that defendant told him that he wanted to take his gun apart because he had shot someone.

¶ 24    Phil Marotta, a Du Page County sheriff's deputy, testified that, on September 24, 2012, he responded to a dispatch regarding a shooting. Upon arrival, he saw Holmes lying in the street. Many people were in the area. Marotta secured the scene before the paramedics arrived. Marotta did not see a weapon on or about Holmes's body. Nor did he see anyone remove anything from or around his body.

¶ 25    The paramedics attending to Holmes did not see a weapon fall out of his sweatshirt when they cut off his clothing. Likewise, the officer who recovered Holmes's property from the hospital did not find a weapon.

¶ 26    A fisherman discovered the gun case while fishing in the Fox River. The case contained part of a Glock pistol, a speeder loader, and a pistol magazine. Collins directed the police to the park where defendant had thrown the bullets down a storm sewer. The police recovered the bullets.

¶ 27    Dr. Jeff Harkey, a forensic pathologist who performed the autopsy on Holmes, testified that Holmes received five gunshot entry and exit wounds: one through the left buttock, one through the right buttock, one through the back of the left arm, one through the high left side of the back, and one through the high right side of the back. Harkey opined, within a reasonable degree of forensic scientific certainty, that Holmes's cause of death was multiple gunshot wounds. Harkey said that the trajectory of the bullets was consistent with Holmes being shot from behind. However, on further questioning, he acknowledged that, because of the various ways a person can move and hold his arm, he could not say whether Holmes was facing the gun when he was shot in the left arm.

¶ 28    Defendant testified that, on September 24, 2012, at 6:20 p.m., he received a phone call from Hernandez's girlfriend, who "sounded shaken." She asked him to come over to Baba's because a group of African American males had come in and threatened Hernandez. On his way to the strip mall where Baba's was located, defendant drove past a group of African American men walking. He did not recognize anyone as he drove past, but he turned around and drove past them again to see if Holmes was in the group. Defendant said that he might have squealed his tires when he turned around. When he passed the second time, he saw Holmes and made eye contact. Holmes pointed at him.

¶ 29    Defendant testified that he drove off and was under the impression that the group was following or chasing him, but once he turned the corner, he "didn't see them for awhile any more [*sic*]." Defendant parked the car, retrieved his gun from the trunk, and loaded it. Defendant agreed that, instead of stopping his car and driving back to Holmes, he could have driven out of the neighborhood. When he drove back, he saw Holmes at the corner of an intersection. Holmes appeared to signal him to come over. Defendant opened the front passenger window with Holmes approximately eight feet in front of him. When Holmes was about five feet away, defendant asked, " 'What's your problem?' "

¶ 30    Defendant testified that Holmes did not say anything as he approached the car, but he looked angry. Holmes's hands were at his waist, and defendant did not see a gun on him. However, because Holmes had "waved all his friends away" and approached defendant's car "so arrogantly" despite knowing that defendant was armed, defendant was worried that Holmes had a gun. Holmes said, " 'What's up,' " which defendant explained could be construed on the street as fighting words. "Typically, after those words are said, there's an altercation following." Defendant took it as a "direct challenge" and saw Holmes "reach for his waistline." Defendant was asked "exactly what [he] saw [Holmes] do with his hands." Defendant said that Holmes grabbed his hoodie at the waistline with his left hand and pulled it up about two or three inches while he reached with his right hand toward his waistline underneath the hoodie. Holmes did not say anything. Defendant testified, "When I seen him reaching, I just reacted and I fired at him." Defendant said that he kept on firing as a reaction and that he was scared that Holmes was pulling a gun on him.

¶ 31    Defendant saw Holmes run and fall. He drove his car near Holmes and got out of the car. Still holding his gun, he went over to Holmes. He did not try to shoot Holmes again; he retained his gun because of potential danger from Holmes's friends. He had planned to call the police and

an ambulance, but when he saw Holmes convulsing on the ground, he was "[a]westruck and scared" and did not know what to do. He jumped in his car and drove away.

¶ 32    After the incident, defendant "vaguely" told Collins what had happened. He told her "maybe three to four times" that he thought Holmes had a gun. Defendant also talked with other people, including Elva, about the incident. It was Elva's idea to get rid of the gun. Defendant and others (1) erased the serial number from the gun so it could not be traced to him, (2) wiped the bullets to remove his fingerprints, (3) disassembled the gun and threw its pieces in separate parts of the river, and (4) threw the bullets in the sewer.

¶ 33    On cross-examination, defendant was specifically asked multiple times whether he saw Holmes with a gun. Defendant consistently said that he did not. For example, he was asked, "[W]hen you drove towards Mr. Holmes, you had no idea whether he had a gun or not, correct?" He answered, "I felt that he did," but he agreed that he "did not see it." When asked to clarify what he told Collins, defendant said, "I told her that I thought he had a gun; that's why I fired on him." The State asked again, "[J]ust so we are clear, you never saw a gun, correct?" Defendant answered, "I did not see it."

¶ 34    On redirect, defendant recounted again that Holmes "pulled up his hoodie and reached with his right hand." That Holmes had "kept coming" despite knowing that defendant had a gun made defendant even more concerned that Holmes had a gun.

¶ 35    Holmes's brother testified that Holmes did everything left-handed except write.

¶ 36    Defendant asked for and received jury instructions on self-defense and second-degree murder based on imperfect self-defense. Following closing arguments, the jury found defendant guilty of first-degree murder and determined that defendant had discharged a firearm that proximately caused the death of another.

¶ 37 The trial court denied defendant's motion for a new trial and sentenced him to 55 years' imprisonment. Defendant appealed, arguing that his conviction should be reduced to second-degree murder because the evidence established that he acted under an unreasonable belief that deadly force was justified. We affirmed. *People v. Cuellar*, 2016 IL App (2d) 140855-U. In doing so, we noted that a reasonable jury could conclude that defendant (1) acted aggressively toward Holmes before the shooting, (2) did not fear for his safety since he ignored numerous opportunities to drive away, and (3) did not subjectively believe that deadly force was needed. *Id.* ¶ 46.

¶ 38                                       B. Postconviction Proceedings

¶ 39 Holmes retained postconviction counsel and, on February 22, 2018, filed a postconviction petition. He asserted, among other things, a claim of actual innocence based on Elva's affidavit. In her affidavit, Elva stated that she had not received a subpoena to testify at defendant's trial. At the time of the trial, she was represented by counsel, who advised her to assert her fifth amendment privilege if she were called to testify, since she was still on parole after being convicted in a related case. However, she had since been discharged from parole and was "now free to testify" on defendant's part. She averred that, "[i]f called to testify, [she] would state, under oath, that [she] was present during the conversation to which [Collins] testified, and also present was [defendant], and [her] other son, [Hernandez], as well as [Hernandez's girlfriend]." She further averred that, "[d]uring that conversation, [defendant] told us what happened between him and [Holmes], and during that conversation, [defendant] did tell us that he saw an object that he believed to be a gun, and that he was in fear of his life when he shot [Holmes]."

¶ 40 Defendant argued in his petition that Elva's affidavit would directly contradict Collins's testimony that defendant never said that he saw a gun on Holmes at the time of the shooting.

Defendant asserted that this evidence was unavailable at the time of trial because Elva was unwilling to testify, on the advice of counsel.

¶ 41    The trial court advanced the petition to the second stage of postconviction proceedings. The State then moved to dismiss the petition. The State argued that Elva's purported testimony was "suspect in nature and of little or no evidentiary value, falling far short of the necessary level of conclusive character that would change the result on retrial." The State specifically noted that (1) defendant implicated Elva in his attempt to cover up his role in the shooting, (2) defendant admitted that he never saw a gun on Holmes, (3) Collins testified that defendant never mentioned that he saw a gun on Holmes, and (4) none of the eyewitnesses saw Holmes with a gun before or during the incident, and no gun was found on or around his body.

¶ 42    The trial court granted the motion to dismiss. In a written order, the court concluded that defendant failed to make a substantial showing of a constitutional violation. The court rejected the suggestion that Elva's proposed testimony was newly discovered evidence because she would have invoked her fifth amendment privilege at trial. The court explained that defendant was necessarily aware of the substance of Elva's proposed testimony before trial since it concerned *defendant's* statements. Also, her testimony would be cumulative of defendant's trial testimony that he believed Holmes had a gun from his attitude and actions before the shooting. The court further determined that Elva's testimony would contradict defendant's testimony that he never saw an object on Holmes that he thought was a gun. Finally, Elva's testimony would not likely change the result on retrial because the jury already heard its substance through defendant's testimony yet still found him guilty. Defendant appeals.

¶ 43                                II. ANALYSIS

¶ 44    Defendant contends that he made a substantial showing of actual innocence to warrant a third-stage postconviction evidentiary hearing. He argues that Elva's proposed testimony was (1) newly discovered evidence because it was unavailable at the time of trial, (2) material, (3) noncumulative, and (4) of such conclusive character that it was likely to change the result on retrial.

¶ 45    "The Act provides a mechanism by which criminal defendants may assert that their convictions or sentences were the result of a substantial violation of their constitutional rights." *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 89. A postconviction proceeding is not a substitute for a direct appeal. *Id.* Rather, it allows the defendant to assert a collateral attack on the final judgment. *Id.*

¶ 46    "The Act provides for a three-stage proceeding, and a defendant must satisfy the requirements of each before continuing to the next stage." *Id.* ¶ 90. At the first stage, the trial court is afforded 90 days to review the petition without input from the State. *Id.* (citing 725 ILCS 5/122-2.1(a)(2) (West 2016)). "The petition must present the gist of a constitutional claim, and the petition will survive so long as it is not frivolous or patently without merit." *Id.*

¶ 47    At the second stage, the trial court may appoint counsel for an indigent defendant. *Id.* ¶ 91 (citing 725 ILCS 5/122-4 (West 2016)). "After counsel has made any necessary amendments to the defendant's claims, the State may move to dismiss or may answer the petition." *Id.* (citing 725 ILCS 5/122-5 (West 2016)). "The petition and any accompanying documentation must make a substantial showing of a constitutional violation." *Id.* "All well-pleaded facts that are not positively rebutted by the record are taken as true." *Id.*

¶ 48    "Finally, at the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted." *Id.* ¶ 92. It then makes fact-finding and credibility

determinations. *Id.* "The defendant must again make a substantial showing of a constitutional violation." *Id.*

¶ 49    Here, defendant retained counsel at the first stage of the postconviction proceedings. The petition advanced to the second stage, where the trial court dismissed it on the pleadings. Under those circumstances, our review is *de novo*. *Id.* ¶ 93.

¶ 50    "A freestanding claim of actual innocence is cognizable under the Act." *Id.* ¶ 94. "In a freestanding claim of actual innocence, the defendant asserts that he is 'innocent of the crime for which he has been tried, convicted, and sentenced.' " *Id.* (quoting *People v. Harris*, 206 Ill. 2d 293, 301 (2002)). "For a freestanding claim of actual innocence to survive the second stage, the petition and supporting documents must make a substantial showing that the evidence supporting actual innocence is (1) newly discovered, (2) material and not merely cumulative, and (3) of a conclusive character." *Id.*

¶ 51                          A. Newly Discovered and Material

¶ 52    Defendant first argues that the evidence is newly discovered because Elva's testimony was not available at trial due to her counsel's advice to exercise her fifth amendment rights were she called to testify. The State concedes that the evidence is material and that it is newly discovered because Elva had pending charges stemming from her involvement in the case and would have invoked her right against self-incrimination. However, a party's concession does not bind us. *People v. Horton*, 2021 IL App (1st) 180551, ¶ 42.

¶ 53    "[M]aterial means that the evidence is relevant and probative of the defendant's innocence." *Rosalez*, 2021 IL App (2d) 200086, ¶ 128. We accept the State's concession that the evidence is material.

¶ 54    However, we hesitate to accept the State's concession that the evidence is newly discovered. "[N]ewly discovered evidence is evidence that was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Id.* ¶ 97 (citing *People v. Burrows*, 172 Ill. 2d 169, 180 (1996)). Evidence is not newly discovered if the defendant was aware of it before trial. Still, exceptions have been carved for instances where a witness is unavailable because of asserting his or her fifth amendment rights. See *id.* ¶¶ 97-105 (discussing cases). However, "it remains that a defendant who is aware of the information at issue prior to trial faces a significant hurdle in demonstrating that the evidence was, nevertheless, *genuinely* unavailable to him." (Emphasis in original.) *Id.* ¶ 105.

¶ 55    Here, while Elva was unavailable to testify at trial, defendant has not explained why he could not have testified that he told Elva that he saw an object that he thought was a gun. However, we need not address the issue, because the evidence fails to satisfy other requirements needed to support an actual-innocence claim. Specifically, the evidence was (1) cumulative, (2) positively rebutted by the record, and (3) not conclusive.

¶ 56              B. Cumulative and Positively Rebutted by the Record

¶ 57    Noncumulative evidence means that the evidence adds to what the jury heard. *Horton*, 2021 IL App (1st) 180551, ¶ 43. A defendant cannot establish a sufficient actual-innocence claim by alleging the same evidence presented to and rejected by the jury. *Id.*

¶ 58    Defendant's theory at trial was that he shot Holmes because he believed that Holmes had a gun. Defendant provided extensive testimony that he believed that Holmes had a gun, and he testified that he told Collins that he believed that Holmes had a gun. Elva's testimony would provide the same information—that defendant shot Holmes because he believed that Holmes had a gun. The distinction between whether he thought Holmes had a gun because he saw an object on

Holmes (as Elva would testify) or because he saw Holmes reaching for his waist (as defendant *did* testify) merely goes to why defendant believed that Holmes had a gun.

¶ 59    To the extent the evidence presents something new, it conflicts with defendant's testimony. While it is inappropriate to resolve evidentiary conflicts during the second stage of postconviction proceedings, we take as true only those facts that are not positively rebutted by the record. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 60    While Elva stated in her affidavit that she was with Collins when defendant said that he saw Holmes with an object that he thought was a gun, defendant repeatedly testified that he *did not* see a gun. His belief that Holmes was armed was based entirely on Holmes' attitude and gestures. He also testified simply that he told Collins that he thought Holmes was armed; he did not say that he told Collins that he saw Holmes with an object he thought was a gun. Collins affirmed that defendant never told her that he saw a gun on Holmes.

¶ 61    Defendant argues that he was asked only if he saw Holmes with a gun and not if he saw Holmes with an object that he thought was a gun. However, as the State observes, this is a meaningless distinction. When asked if he saw Holmes with a gun, defendant could have replied that he saw Holmes with an object he thought was a gun. Defendant also could have given this answer when asked open-ended questions about what he saw. Thus, the ultimate fact gleaned from Elva's affidavit, that defendant saw an object that he thought was a gun, was positively rebutted by defendant's testimony that only Holmes's attitude and actions made him believe that Holmes was armed.

¶ 62    However, defendant claims that, under *Robinson*, we cannot go so far as to find that no fact finder would ever accept the truth of Elva's statement that defendant told her that he saw an object he thought was a gun. We take Elva's affidavit as true as to what defendant told her. However, as noted, the substance of that statement was positively rebutted by the record. In any event, Elva's affidavit fails for the additional reason that it was not of such a conclusive character as to probably change the result on a retrial.

¶ 63                               C. Conclusive Character of the Evidence

¶ 64    Defendant argues that, under *Robinson*, Elva's affidavit places the trial evidence in a different light and undermines confidence in the judgment of guilt, namely the rejection of the theories of self-defense and second-degree murder based on imperfect self-defense. See *Robinson*, 2020 IL 123849, ¶ 56. The State suggests that we apply a higher standard than the supreme court in *Robinson*, which involved the denial of a motion for leave to file a successive postconviction petition and not, as here, a second-stage dismissal of a petition. However, we apply the *Robinson* standard to a second-stage dismissal as well. See *Rosalez*, 2021 IL App (2d) 200086, ¶¶ 3, 133.

¶ 65    The State also suggests that Elva's affidavit cannot support a second-degree murder conviction because such a claim does not constitute a claim of actual innocence. See *People v. Moore*, 2021 IL App (2d) 180368-U, ¶ 65 ("[N]ewly discovered evidence that would merely reduce the defendant's liability from first-degree murder to second-degree murder does not establish actual innocence."). Defendant argues that *Robinson* rejected that proposition. However, we need not, and do not, decide that matter. Instead, we find that, even if an argument for a second-degree-murder finding is properly a claim of actual innocence, the statement in Elva's affidavit was not conclusive.

¶ 66    Evidence is conclusive when, considered along with the trial evidence, it would probably lead to a different result. *Rosalez*, 2021 IL App (2d) 200086, ¶ 133. "The new evidence need not be completely dispositive." *Id.* Our supreme court rejected a "total vindication or exoneration" standard in Robinson. *Id.* ¶ 148 (citing *Robinson*, 2020 IL 123849, ¶ 55). "Rather, '[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together.' " *Id.* ¶ 133 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 97). "The question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* (citing *People v. Robinson*, 2020 IL 123849, ¶ 48). "[N]ewly discovered evidence 'which merely impeaches a witness' will typically not be of such conclusive character as to justify postconviction relief." *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007) (quoting *People v. Chew*, 160 Ill. App. 3d 1082, 1086 (1987)). See also *People v. Harris*, 154 Ill. App. 3d 308, 319 (1987) ("Newly discovered evidence which merely has the effect of impeaching, discrediting, or contradicting a witness does not afford a basis for a new trial.").

¶ 67    "Section 9-2 of the Criminal Code of 1961 provides for two forms of second-degree murder." *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148. The second occurs when: " '[a]t the time of the killing [defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.' " *Id.* (quoting 720 ILCS 5/9-2 (West 2008)). "This second form of second-degree murder is known as imperfect self-defense, and 'occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.' " *Id.* (quoting *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995)).

¶ 68    The elements of the affirmative defense of self-defense are:

"(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004); 720 ILCS 5/7-1(a) (West 2012).

Because self-defense is "a justifying or exonerating circumstance," it may serve as the basis for an actual innocence claim. (Internal quotation marks omitted.) *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41. Self-defense is distinct from second-degree murder only in terms of the nature of the defendant's belief at the time of the killing. *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). Self-defense requires that the defendant reasonably believe that force is necessary, while a conviction of second-degree murder may be appropriate where the defendant's belief in the need for force was unreasonable. *Id.*; see also 720 ILCS 5/9-2(a)(2) (West 2012). A defendant cannot be found guilty of second-degree murder based on an unreasonable belief in the need for the use of force unless the proof at trial establishes the first five elements of self-defense. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 69     We consider Elva's affidavit alongside the evidence at trial. As we explained in our disposition on direct appeal, the evidence at trial did not establish second-degree murder based on imperfect self-defense. See *Cuellar*, 2016 IL App (2d) 140855-U, ¶ 46. Rather, the evidence established that defendant was the aggressor. Defendant drove by Holmes's group and turned around, squealing his tires, to see if Holmes was with them. Defendant made eye contact with Holmes. Each reportedly pointed at the other. Defendant drove away only to stop, retrieve and load his weapon, and drive back to Holmes. Defendant and Holmes were five feet apart when

Holmes asked, " 'What's your problem?' " Although defendant said that he thought the others were chasing him, the evidence did not support that conclusion, and he admitted that he did not see them after he turned the corner. He also admitted that he could have left the area rather than confront Holmes.

¶ 70    Defendant repeatedly testified at trial that Holmes moved such that he believed that a gun was being drawn. However, he also repeatedly stated that he did not see a gun. There was no evidence that Holmes had a gun. Indeed, there was uncontroverted evidence that Holmes was primarily shot from behind. After the shooting, defendant drove over to Holmes, approached him on foot, and asked him, " 'Have you had enough?' " Holmes admitted he was still carrying the gun at that time, and one of Holmes's companions testified that defendant attempted to shoot Holmes again.

¶ 71    Elva's affidavit at most corroborated defendant's stated belief that Holmes had a gun such that defendant actually and subjectively believed that a danger existed. However, as explained, a defendant's actual and subjective belief that a danger existed requiring the use of force is not the only element of self-defense *or* imperfect self-defense. Elva's testimony would impeach Collins, but it would not contradict the evidence of defendant's aggression or meaningfully substantiate any threat of force against defendant. Thus, the affidavit is not conclusive enough that the result would probably be different on retrial.

¶ 72                                   III. CONCLUSION

¶ 73    For the reasons stated, we agree with the trial court that defendant did not make a substantial showing of actual innocence. Accordingly, we affirm the judgment of the circuit court of Du Page County dismissing defendant's postconviction petition at the second stage.

¶ 74    Affirmed.