NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 231586-U

NO. 4-23-1586

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JAVARUS T. LEACH, | ) | No. 03CF2076 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John T. Gibbons, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The appellate court affirmed the trial court's order denying defendant leave to file a successive postconviction petition because defendant did not allege a colorable claim of actual innocence.

¶ 2     In August 2005, a jury found defendant, Javarus T. Leach, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2002)), and the trial court later sentenced him to 60 years in prison. In April 2022, defendant filed a motion for leave to file a successive postconviction petition alleging actual innocence based upon newly discovered evidence in the form of an affidavit from Anna Martin Jones. In December 2023, the court denied defendant's motion.

¶ 3     Defendant appeals, arguing that the trial court erred by denying defendant leave to file a successive postconviction petition because he set forth a colorable claim of actual innocence.

¶ 4     We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                        A. The Charges, Jury Trial, and Sentence

¶ 7        In August 2003, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(2) (West 2002)), alleging that in July 2003, defendant shot and killed Quantel Blaylock.

¶ 8        In August 2005, the trial court conducted defendant's jury trial. The State presented the testimony of six eyewitnesses who were present at the intersection of Henrietta and West State Streets in Rockford, Illinois, on the evening of July 24, 2003, when Blaylock was shot. Each witness testified similarly that defendant and Blaylock were arguing in the street. Blaylock told defendant that he did not want to argue. Defendant pulled a gun and pointed it at Blaylock. Two of the six eyewitnesses additionally testified that Blaylock put his hands up when defendant pulled out his gun and pointed it at Blaylock. All six eyewitnesses testified that Blaylock then turned around and began running away. Defendant chased after Blaylock and shot at Blaylock's back.

¶ 9        Blaylock's brother, Quartez, testified that, when the first bullet hit Blaylock, "he leaned forward trying to get his balance, but he was still running." Quartez continued, "After the second shot, he was limping. He was trying to get away limping." Quartez further stated that he got Blaylock into his car and as they drove away, defendant continued shooting at their car, hitting the trunk. Quartez's testimony on this point was corroborated by photographs of bullet holes in the trunk. Quartez drove Blaylock to the hospital, where Blaylock eventually died.

¶ 10        A forensic pathologist testified that Blaylock suffered two gunshot wounds. One shot entered his left hip and did not exit. The other shot entered his back, traveled through his lung, and exited his chest. Blaylock died of pneumonia resulting from the gunshot wound.

¶ 11        A Woodridge police officer testified that, on August 3, 2003, he located defendant at a home in Woodridge, Illinois. (Woodridge is approximately 89 miles from Rockford.)

Defendant initially gave a false name but later gave his true name at the police station, after learning he could be charged with obstructing justice.

¶ 12        A Rockford police detective testified that he attempted to obtain defendant's "side of the story" on four separate occasions between August 3 and August 14, 2003. During one interview, the detective provided defendant with details of the investigation, including the eyewitness statements implicating defendant, and asked defendant whether it was possible Blaylock had a gun and defendant shot him in self-defense. Each time the detective asked defendant for his statement, defendant answered that he was not present and did not know Blaylock.

¶ 13        Defendant testified that he went to the intersection of Henrietta and West State streets to visit a friend. Defendant was standing with another friend, Darrell Cross, outside of Cross's parked car, when Blaylock and three other men all approached defendant, yelling at him. Defendant testified he was scared and was trying to keep an eye on everyone. He saw Blaylock reach under his shirt, so defendant pulled out his gun and "wav[ed] it around." Defendant testified that he said, "[G]et back," and Blaylock then reached slowly under his shirt. Defendant explained that because he saw the butt of a gun in Blaylock's waistband, he shot Blaylock three times. He did not remember what happened after the shooting except that everyone began running.

¶ 14        On cross-examination, defendant agreed that each time detectives asked for his side of the story, he told them he was not present at the shooting.

¶ 15        The only other witness to testify for the defense was Lonnie Thomas, who testified regarding a fight in 1998 that may have been the motivating incident for the 2003 shooting.

¶ 16        The trial court instructed the jury on self-defense and second degree murder. The jury found defendant guilty of first degree murder.

¶ 17        The trial court subsequently sentenced defendant to a total of 60 years in prison (35 years for first degree murder plus a 25-year mandatory firearm enhancement).

¶ 18                                B. The Direct Appeal

¶ 19        In 2005, defendant appealed, arguing that the trial court erred when sentencing him because it failed to consider the cumulative effect of the normal sentence for first degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2004)) and the add-on for the use of a firearm in conjunction with the murder (see *id.* § 5-8-1(a)(1)(d)(iii)). The appellate court affirmed. *People v. Leach*, No. 2-05-1010 (2007) (unpublished order under Supreme Court Rule 23).

¶ 20                        C. The Initial Postconviction Petition

¶ 21        In March 2008, defendant filed a petition seeking relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)), alleging various ways his trial counsel had rendered ineffective assistance at trial. In August 2010, defendant filed a third amended petition alleging several claims of ineffective assistance, actual innocence, and trial errors by the trial court.

¶ 22        In August 2013, following a hearing on the State's motion to dismiss defendant's petition, the trial court dismissed some of defendant's claims and allowed others to proceed. (We note that the case was then delayed for several years due to a change in attorneys and litigation of supplemental claims.)

¶ 23        In November 2021, the trial court conducted a third-stage evidentiary hearing concerning defendant's remaining claims, and in December 2021, the court issued its oral ruling denying defendant's petition. At that hearing, after the court had ruled, defendant told the court that he had received an affidavit from Anna Martin Jones and he wished to "add it up under newly discovered evidence." The court replied that "[i]t's too late for that." Defendant asserted that he

"told Counsel about this and *** sent it to Counsel and Counsel told [defendant] that he couldn't put it in." The court again replied that it was "too late." Defendant appealed.

¶ 24        In April 2023, this court affirmed the trial court's denial of defendant's initial postconviction petition. *People v. Leach*, 2023 IL App (4th) 220014-U.

¶ 25                    D. The First Successive Postconviction Petition

¶ 26        In April 2022, while the appeal of defendant's initial postconviction petition was still pending, defendant *pro se* filed his first motion for leave to file a successive postconviction petition, which is the subject of this appeal. The petition alleged, in relevant part, (1) actual innocence based on Jones's affidavit and (2) ineffective assistance due to postconviction counsel's failure to amend the initial postconviction petition to include Jones's affidavit.

¶ 27        Jones's affidavit, which was attached to the proposed successive petition and was dated July 12, 2021, stated as follows:

> "On or around July 24th[,] 2003, around 6:30 or 7:00, Quantel Blaylock, my boyfriend and I went to visit a friend. The friend [*sic*] name was Chuck. While we were there, they started talking about a fighting incident with a boy named J-Moe. After their brief discussion [Blaylock] called a dude named Percy or Purcell and told him to call [defendant] up for some weed and have him meet him on Henrietta and West State Street. After getting of [*sic*] the phone both men [Blaylock] and Chuck laughed about how they were finna get down on [defendant]. I took get down to mean rob or kill because both [Blaylock] and Chuck had guns on them. [Blaylock] and Chuck got picked up by some females and I left. I never came forth initially because I was still involved with [Blaylock's] friend on and off until he passed away in 2013. The reason I came forth now is because I have two

- 5 -

grown sons in the streets and if some scenario played out with one of my kids, I would want someone to come forward."

¶ 28          In April 2022, the trial court conducted a hearing on defendant's motion for leave to file a successive petition and concluded that the court did not have jurisdiction because defendant's appeal relating to his initial postconviction petition was still pending. The court entered an order stating "the court lacks jurisdiction. The matter is on appeal." Defendant appealed.

¶ 29          We note that, in December 2022, while defendant's appeal from the trial court's finding that it did not have jurisdiction to consider defendant's first motion for leave to file a successive postconviction petition was pending, defendant *pro se* filed a second motion for leave to file a successive postconviction petition, alleging a *Miller* based proportionate penalties claim challenging his sentence. In February 2023, the trial court denied defendant's motion, and in January 2024, this court affirmed. *People v. Leach*, 2024 IL App (4th) 230298.

¶ 30          In April 2023, this court entered a summary order reversing the trial court's determination that it did not have jurisdiction to rule on defendant's first motion for leave to file a successive postconviction petition and remanding for further proceedings. *People v. Leach*, No. 4-22-0676 (2023) (unpublished summary order under Illinois Supreme Court rule 23(c)).

¶ 31          In December 2023, the trial court conducted a hearing on defendant's first motion for leave to file a successive postconviction petition. The trial court, applying the pleading standards for successive postconviction petitions set forth by the supreme court in *People v. Robinson*, 2020 IL 123849, denied defendant leave to file his successive petition, finding that the Jones affidavit, when considered along with the trial evidence, did not create a probability of a different outcome on retrial. In other words, the newly discovered evidence was not conclusive enough to establish an actual innocence claim. Because the evidence was not conclusive,

postconviction counsel was not ineffective for failing to include the affidavit in the initial postconviction petition.

¶ 32     This appeal followed.

¶ 33                                    II. ANALYSIS

¶ 34     Defendant appeals, arguing that the trial court erred by denying defendant leave to file a successive postconviction petition because he set forth a colorable claim of actual innocence. We disagree and affirm.

¶ 35                              A. The Applicable Law

¶ 36     The Illinois Supreme Court set forth the following law applicable to successive postconviction petitions alleging claims of actual innocence in *Robinson*, 2020 IL 123849, ¶¶ 42-48:

> "The Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial. [Citation.] The Act is not a substitute for an appeal but offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment. [Citation.] Therefore, where a petitioner has previously challenged a judgment of conviction on appeal, the judgment of the reviewing court will serve to bar postconviction review of all issues actually decided by the reviewing court as well as any other claims that could have been presented to the reviewing court. [Citation.] As a consequence, only one postconviction petition is contemplated under the Act. [Citation.] However, the bar against successive proceedings will be relaxed on two grounds. [Citation.] The first is whether the petitioner can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding. [Citations.] The second is where the

petitioner asserts a fundamental miscarriage of justice based on actual innocence. [Citation.]

Prior to commencing a successive postconviction petition, a petitioner must obtain leave of court. [Citation.] A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit. [Citations.] If leave to file is granted, a successive petition is docketed for second-stage proceedings, at which the petitioner must make a substantial showing of actual innocence to warrant an evidentiary hearing. [Citations.] The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition. [Citations.]

A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. [Citation.] Accordingly, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. [Citation.]

At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. [Citations.] In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual

and credibility determinations. [Citations.]

*** 

To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative to the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]

Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence."

¶ 37 The supreme court recently reaffirmed the above principles set forth in *Robinson* in *People v. Harris*, 2024 IL 129753, ¶¶ 42-48.

¶ 38 The denial of leave to file a successive postconviction petition alleging actual

- 9 -

innocence is reviewed *de novo*. *Id.* ¶ 44.

¶ 39                                    B. This Case

¶ 40        Defendant argues that he sufficiently stated a claim of actual innocence because the Jones affidavit was (1) newly discovered, (2) material and noncumulative, and (3) conclusive. Because we have determined that the evidence supporting defendant's proposed successive petition was not conclusive, we need not determine whether the evidence was also newly discovered, material, and noncumulative. See *People v. Sanders*, 2016 IL 118123, ¶ 47 ("We need not address whether petitioner's new evidence [is newly discovered, material, and noncumulative] because ***, even assuming these conditions have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial.").

¶ 41        Regarding the conclusiveness element, defendant asserts that the Jones affidavit "would probably change the result on retrial" because "evidence that [Blaylock] had Purcell get [defendant] to the scene and was armed and voiced an intent to harm [defendant] right before the shooting" would "corroborate [defendant's] assertions of self-defense."

¶ 42        Defendant relies primarily on *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 1, which involved an appeal from a second-stage dismissal of an actual innocence claim based upon an affidavit from "a previously unknown eyewitness who would testify that he saw another man shoot and kill the victim." At trial, the State presented testimony of two eyewitnesses who testified that they were inside a barbershop with the victim on the night of the shooting when the defendant came in with two other men and accused one of the eyewitnesses—Markis Robinson—of having tried to rob him. *Id.* ¶¶ 11-12. The victim, who was unarmed, tried to intervene, and the defendant shot him three times. *Id.* A grainy surveillance video depicted "a number of individuals entering, exiting, and standing in front of the barbershop at various times," none of them having

recognizable facial features. *Id.* ¶ 17.

¶ 43 The defendant told the police that he did confront Robinson about having robbed him earlier, and while he was engaged with Robinson, a man he did not know came through the front door and confronted the victim about something unrelated. *Id.* ¶¶ 21-23. During that confrontation, the victim reached for his hip, and the unknown man began shooting. *Id.* ¶ 23. After the shooter left, everyone ran. *Id.*

¶ 44 In a postconviction petition, the defendant alleged a claim of actual innocence, supported by the affidavit of Lester Owens. *Id.* ¶ 44. Owens averred that on the night of the shooting, a man named Danny Blackwell asked him for a ride to the barbershop. *Id.* Owens took Blackwell to the shop and remained outside when Blackwell went in. *Id.* Through the large front window, Owens saw Blackwell pull a gun and shoot another man who was also inside the shop. *Id.*

¶ 45 The trial court dismissed the defendant's claim, concluding that the Owens affidavit was not "of such a conclusive character that it would probably change the result of retrial." *Id.* ¶ 68 (Internal quotation marks omitted.) The appellate court reversed, concluding that the Owens affidavit provided "significant corroboration" for the defendant's "unwavering insistence that someone else was the shooter in this case." *Id.* ¶ 76. The court acknowledged that two witnesses had identified the defendant as the shooter at trial but determined that there were reasons, "based on this record," that a jury could reject those identifications. *Id.* ¶ 81.

¶ 46 We conclude that *Wilson* bears little resemblance to the present case. In *Wilson*, the new eyewitness—Owens—actually saw the shooting. Moreover, the defendant in *Wilson* was not claiming self-defense but instead that he was not the shooter.

¶ 47 For the same reason, defendant's reliance on *People v. Harvell*, 2024 IL App (4th)

230152-U, ¶ 31, is misplaced. Like in *Wilson*—and unlike the present case—in *Harvell*, the affidavit supporting the defendant's actual innocence claim contained a new account from an eyewitness to the actual shooting (in the form of a double-hearsay conversation, but an eyewitness account nonetheless). *Id.*

¶ 48    More apt here is *People v. Horton*, 2021 IL App (1st) 180551, ¶¶ 34-35, because, like the present case, the affiant was not present for the shooting and the defendant was claiming self-defense. In *Horton*, the defendant was convicted of first degree murder for shooting Steven Williams following an altercation at a block party. *Id.* ¶ 3. At trial, the defendant asserted that he shot Williams in self-defense, testifying that while he and Williams were arguing, Williams pulled a gun and pointed it at him, prompting the defendant to pull his own gun from his waistband and shoot Williams. *Id.* ¶ 24. The defendant fled the state and was arrested a few days later. *Id.*

¶ 49    The defendant sought leave to file a successive postconviction petition alleging actual innocence, arguing that newly discovered evidence "supported his otherwise uncorroborated claim of self-defense, and would probably change the result on retrial." *Id.* ¶ 1. The newly discovered evidence was in the form of an affidavit from Damien Hyde, stating that on the night of the shooting, about an hour before the shooting occurred, Willliams met up with Hyde "at the spot where we kept all the guns" and obtained a .45 caliber handgun from Hyde. According to Hyde's affidavit, Williams was "very mad and looking crazy," and Williams left saying he was "about to take care of" the defendant. *Id.* ¶ 32.

¶ 50    The trial court denied the defendant's motion, ruling that the successive petition "did not 'come close' to establishing a claim of actual innocence ***, noting Hyde was not present when the shooting happened." *Id.* ¶ 34. The appellate court affirmed, concluding that Hyde's supporting affidavit failed to present a colorable claim of actual innocence based on self-defense.

*Id.* ¶ 47.

¶ 51        The appellate court first noted that in order to raise a claim of self-defense, a defendant must present evidence that (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force used was necessary; and (6) his beliefs were reasonable. *Id.* ¶ 46 (citing *People v. Morgan*, 187 Ill. 2d 500, 533 (1999)). The court then concluded as follows:

> "Hyde's affidavit alleges that he gave Williams a gun on the night of the shooting [and] claims that Wiliams went to kill defendant ***. But Hyde did not witness the shooting and does not allege that Williams ever displayed or threatened to use the gun. *** [W]e find that Hyde's proposed testimony fails to show the essential elements of self-defense, *i.e.*, that force was threatened against [the] defendant, that [the] defendant was not the aggressor, that the danger of harm was imminent, that the threatened force was unlawful, and that [the] defendant reasonably believed a danger existed and that shooting Williams was necessary to avert that danger. [Citation.] Therefore, [the] defendant has not raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." (Internal quotation marks omitted.) *Id.* ¶ 52.

¶ 52        The *Horton* court discussed its earlier decision in *People v. Smith*, 2021 IL App (1st) 181178-U, in which the defendant, who had claimed self-defense but been convicted of first degree murder, filed a postconviction petition alleging ineffective assistance for his counsel's failure to investigate a witness who submitted an affidavit saying she "heard gunshots, ran in their direction, saw the victim on the ground with a gun in his hand, and then saw another man take the

gun and run away." *Horton*, 2021 IL App (1st) 180551, ¶ 50. The appellate court in *Smith* affirmed the summary dismissal of the petition, rejecting the defendant's argument that the witness's testimony "would have supported and increased the credibility of his claim of self-defense." *Id.* ¶ 51.

¶ 53          As the *Horton* court noted, the court in *Smith* acknowledged that the proposed testimony suggested that the victim may have had a gun on his person when the defendant shot him but it "did not establish that the defendant saw a gun or knew the victim was armed and did not establish that the victim threatened imminent force against the defendant before the defendant shot him." *Id.* Therefore, the proposed testimony "did not even arguably establish self-defense because [the witness could not] establish the essential elements that unlawful force was threatened against defendant and the danger of harm was imminent." (Internal quotation marks omitted.) *Id.* Because the testimony could not establish self-defense, there was not a reasonable probability that the evidence would have changed the outcome of the trial. *Id.*

¶ 54          Similarly instructive is the recent decision in *People v. Lard*, 2024 IL App (1st) 220089-U, ¶¶ 36, 40-44, in which the appellate court affirmed the summary dismissal of the defendant's actual innocence claim because neither of the two affiants saw the actual shooting: the first affiant described seeing events immediately prior to the shooting, and the second affiant described seeing events immediately after the shooting. The court rejected the defendant's claim that the affidavits supported his claim of self-defense and unreasonable belief of self-defense— and therefore, actual innocence—because "whether [the defendant] acted in self-defense or unreasonable self-defense depends on [the victim's] actions in the apartment," which neither affiant witnessed. *Id.*; see *People v. Cuellar*, 2022 IL App (2d) 200074-U, ¶ 72 (affirming the dismissal of the defendant's actual innocence claim because his mother's affidavit stating the

defendant told her immediately after the shooting that he believed the victim had a gun "would not contradict the evidence of [the] defendant's aggression or meaningfully substantiate any threat of force against [the] defendant"); see also *People v. Hollis*, 2021 IL App (1st) 200505-U, ¶ 32 (stating because the affiants did not actually witness the shooting, they could not show the necessary elements of self-defense, such as whether the victim actually threatened imminent and unlawful force against the petitioner, such that the petitioner was justified in shooting the victim).

¶ 55 The present case is similar to *Horton*, *Smith*, *Lard*, *Cuellar*, and *Hollis*, in that defendant asserts that Jones's affidavit supports his claim of self-defense, and, therefore, actual innocence. However, like in the foregoing cases, Jones's potential testimony, taken as true, does not establish the necessary elements of self-defense. Although she saw Blaylock with a gun prior to the shooting and he stated an intent to harm defendant, Jones did not see the shooting itself and offers no relevant testimony regarding whether, at the time of the shooting, Blaylock still had the gun or threatened to use it. To the contrary, six eyewitnesses at trial testified that Blaylock did *not* have or display a gun, and two of them testified that he raised his hands in the air and backed away from defendant. The witnesses who saw the shooting testified that Blaylock said he did not want to argue, and the forensic evidence showed that Blaylock was shot in the back when he turned to run away.

¶ 56 Put another way, a jury could believe Jones's testimony that Blaylock had a gun two hours before the shooting and stated an intention to use it but also believe the six eyewitnesses who stated Blaylock, two hours later, did not have that gun or, if he did, did not display it or threaten defendant. Accordingly, Jones's potential testimony, taken as true and considered with the rest of the evidence, is not of such conclusive character that it would likely change the result on retrial.

¶ 57 For the foregoing reasons, we conclude that the trial court correctly determined that defendant's proposed successive petition failed to set forth a colorable claim of actual innocence because the supporting documentation did not raise the probability that it was more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence.

¶ 58                                    III. CONCLUSION

¶ 59 For the reasons stated, we affirm the trial court's judgment.

¶ 60 Affirmed.